REVISED OCTOBER 26, 2001

# United States Court of Appeals
**For the Fifth Circuit**

_____

No. 00-10517
con w/ 00-10883

_____

**Harken Exploration Company,**
*Plaintiff-Counter Defendant-Appellee,*


v.


**Sphere Drake Insurance PLC, also known as Odyssey Re (London) Limited,**
*Defendant-Counter Claimant-Appellant,*

**Commercial Underwriters Insurance Company,**
*Defendant-Appellant.*

_____

Appeals from the United States District Court
for the Northern District of Texas

_____

August 16, 2001

Before **REYNALDO G. GARZA, HIGGINBOTHAM,** and **SMITH,** Circuit Judges.

**REYNALDO G. GARZA,** Circuit Judge:

Sphere Drake Insurance PLC (hereinafter "Sphere") and Commercial Underwriters

Insurance Company (hereinafter "Commercial") (collectively hereinafter "Appellants") appeal the

Dallas Federal District Court's ruling that they had a duty to defend Harken Exploration

Company (hereinafter "Harken") in Harken's underlying federal and state lawsuits, the award of

Harken's defense costs for the underlying lawsuits, and the use of a 10% interest rate to calculate

1

prejudgment interest.  For the reasons stated below, we **Affirm**.

## 1.      Factual and Procedural Background.

Harken is an oil and gas exploration and production company.  On December 15, 1995,

Harken purchased an oil and gas lease (hereinafter "Lease") that covered Big Creek Ranch

(hereinafter "Ranch") from Momentum Operating Company, Inc.  Thereafter, Harken commenced

oil and gas operations on the Ranch.  The Rice Family Living Trust (hereinafter "Trust") owns the

Ranch.  D.E. Rice and Karen Rice (hereinafter "Rices") are the Trust's trustees.

On October 24, 1997, the Rices, on behalf of the Trust, sued Harken in Amarillo Federal

District Court (hereinafter "Amarillo Court") alleging that Harken polluted the Ranch (hereinafter

"Federal Lawsuit").  The Rices asserted causes of action for violation of the Oil Pollution Act,[1]

breach of the Lease, breach of the pipeline easement, negligence, including negligent discharge of

saltwater, negligence per se, nuisance, trespass, and equitable relief.

Harken notified the Appellants of the claims filed against it and asked the Appellants to

defend it in the Federal Lawsuit.  Harken carried two separate, successive commercial general

liability policies; one issued by each of Appellants.  The policy Sphere issued insured Harken from

October 1, 1995 through October 1, 1996 (hereinafter "Sphere Policy").  The policy Commercial

issued insured Harken from October 1, 1996 through October 1, 1997 (hereinafter "Commercial

Policy") (collectively hereinafter "Policies").  The Appellants denied Harken's request and refused

to defend it in the Federal Lawsuit.

Harken filed a declaratory judgment action in state court to determine whether the

Appellants had a duty to defend it in the Federal Lawsuit.  The Appellants removed this action to

---

[1]33 U.S.C. §§ 2701-2720.

2

the Dallas Federal District Court (hereinafter "Dallas Court") based on diversity.  The three parties, Harken, Sphere, and Commercial, each filed motions for partial summary judgment. Before the Dallas Court ruled on the motions for summary judgment, the Amarillo Court dismissed the Rices' Oil Pollution Act claims and the remaining supplemental state law claims for want of jurisdiction.[2]  In response to the dismissal, the Rices sued Harken in state court asserting the same causes of action, minus the Oil Pollution Act claim (hereinafter "State Lawsuit"). Harken notified the Appellants of the State Lawsuit and asked them to defend it in that lawsuit. The Appellants refused.  On February 10, 2000, the Dallas Court granted partial summary judgment in favor of Harken.

At this point, Harken had not expressly amended its pleading or its motion for summary judgment to include the State Lawsuit.  In its motion for entry of judgment, Harken presented the Dallas Court with the State Lawsuit's original petition and asked the court to enter a judgment that the Appellants had a duty to defend it in both the Federal Lawsuit and the State Lawsuit (collectively hereinafter "Lawsuits").  The Appellants responded and presented evidence in opposition.  On April 14, 2000, the Dallas Court entered its final judgment.  The Dallas Court decided that the Appellants had a duty to defend Harken in the Lawsuits and that by failing to do so breached the Policies.  The Dallas Court awarded Harken its defense costs in the Lawsuits (attorneys' fees and court costs), prejudgment interest at 10%, and later, attorneys' fees and expenses in this case.

**2.      Discussion.**

---

[2]The Rices appealed the dismissal of the Federal Lawsuit to this Court, and we affirmed. *D.E. Rice v. Harken Exploration Co.,* 250 F.3d 264 (5th Cir. 2001).

The Appellants appeal the Dallas Court's grant of partial summary judgment in favor of Harken. They contend that they do not owe Harken a duty to defend because: 1) there was not an "occurrence" as defined by the Policies; 2) the Saline Clause only obligates the Appellants to indemnify Harken, not defend it; and 3) the property damage alleged did not occur during the Policies' periods. The Appellants, further, contend that the Dallas Court erred when it awarded Harken the Lawsuits' defense costs and used a 10% interest rate to calculate prejudgment interest.

**2.1     The Appellants have a duty to defend Harken.**

We review a federal district court's grant of summary judgment *de novo*, applying the same standard of review as would the district court. *Merritt-Campbell, Inc. v. RxP Products, Inc.,* 164 F.3d 957, 961 (5th Cir. 1999). Summary judgment is only proper when there is not a genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. *Id.* We view the evidence in the light most favorable to the non-movant and make all reasonable inferences in her favor. *Merritt-Campbell, Inc,* 164 F.3d at 961; *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587-588 (1986). A fact is material if it might affect the outcome of the suit under the governing law. *Merritt-Campbell, Inc,* 164 F.3d at 961; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). There is a genuine issue as to a material fact if the evidence is such that a reasonable jury could return a verdict for the non-movant. *Merritt-Campbell,* 164 F.3d at 961.

The Appellants contend that the Dallas Court erred when it held that the Appellants have a duty to defend Harken. Under Texas Law, an insurer's duty to defend is usually determined

solely from the allegations in the most recent petition and the language of the insurance policy.[3]

*Nat'l Union fire Ins. Co. of Pittsburgh, Pa. v. Merch. Fast Motor Lines, Inc.,* 939 S.W.2d 139, 141 (Tex. 1997). The insured bears the initial burden of showing that the claim against her is potentially within the insurance policy's scope of coverage. *Employers Casualty Co. v. Block,* 744 S.W.2d 940, 945 (Tex. 1988). If the insurer relies on the policy's exclusions to deny coverage, the burden shifts to the insurer to prove the exclusion applies. *Federated Mut. Ins. Co.,* 197 F.3d at 723, *citing Guaranty Nat'l Ins. Co. v. Vic. Mfg. Co.,* 143 F.3d 192, 193 (5th Cir. 1998), *citing Telepak v. United Services Auto Ass'n.,* 887 S.W.2d 506, 507 (Tex.App.–San Antonio 1994, writ denied). If the insurer is successful, the burden shifts back to the insured to show that an exception to the exclusion brings the claim against her potentially within the scope of coverage under the insurance policy. *Federated Mut. Ins. Co.,* 197 F.3d at 723, *citing Guaranty Nat'l Ins. Co.,* 143 F.3d at 193, *citing Telepak,* 887 S.W.2d at 507.

"The general rule is that the insurer is obligated to defend [its insured] if there is, potentially, a case under the complaint within the coverage of the policy." *Merch. Fast Motor Lines, Inc.,* 939 S.W.2d at 141. If there is a "doubt as to whether or not the [factual] allegations

---

[3]Insurance policies are contracts. *Amica Mut. Ins. Co. v. Moak,* 55 F.3d 1093, 1095 (5th Cir. 1995). In diversity cases such as this one, we apply state law rules of construction. *Id.* Therefore, Texas's rules of contract interpretation control. *See Hamilton v. Segue Software Inc.,* 232 F.3d 473, 477 (5th Cir. 2000); *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938). We are bound to apply the law as interpreted by the state's highest court, in this case, the Texas Supreme Court. *See Barfield v. Madison County, Miss.,* 212 F.3d 269, 271-72 (5th Cir. 2000). If the state's highest court has not definitively ruled on a particular issue, it is our duty to predict how that court would decide the issue. *Barfield,* 212 F.3d at 272; *Matheny v. Glen Falls Ins. Co.,* 152 F.3d 348, 353-54 (5th Cir. 1998). Intermediate state courts of appeals' decisions can be persuasive, but are not controlling. *Barfield,* 212 F.3d at 272; *Matheny,* 152 F.3d at 354. And we must not "expand state law beyond its presently existing boundaries." *Barfield,* 212 F.3d at 272 (internal citations omitted).

5

of a complaint against the insured state a cause of action within the coverage of a liability policy sufficient to compel the insurer to defend the action, such doubt will be resolved in [the] insured's favor." *Id.*

### 2.11 The Rices alleged an "occurrence."

The Parties agree that initially under the Policies the Appellants have a duty to defend Harken against a suit alleging damages caused by an occurrence. The first step in determining whether the Appellants have a duty to defend Harken against the Lawsuit is to determine whether the Rices alleged an occurrence.

The Policies define occurrence as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." The Policies, however, do not define accident. Thus, we must give accident its plain, ordinary, and generally accepted meaning. *See Western Reserve Life Ins. V. Meadows,* 261 S.W.2d 554, 557 (Tex. 1953) ("[i]t is well-settled law in this state that contracts of insurance in their construction are governed by the same rules as other contracts, and that terms used in them are to be given their plain, ordinary, and generally accepted meaning unless the instrument itself shows the them to have been used in a technical or different sense.") (giving "war" its plain, ordinary, and generally accepted meaning); *Gonzalez,* 795 S.W.2d at 736 (giving "bodily injury," "sickness," "disease," "death," and "including" their plain, ordinary, and generally accepted meaning).

The Texas Supreme Court has not articulated a hard and fast rule for when an accident occurs. *See Mid-Century Ins. Co. of Texas v. Lindsey*, 997 S.W.2d 153, 155 (Tex. 1999)("[a]n injury caused by voluntary and intentional conduct is not an accident just because the result or

6

injury may have been unexpected, unforeseen, and unintended . . . [although,] the mere fact that an actor intended to engage in the conduct that gave rise to the injury does not mean that the injury was not accidental."). It is reasonably clear that an accident has two elements: 1) an action and 2) that action's effect–that is, the resulting damage. *See id.* There are also two factors that influence both elements: a) an intent or design factor and b) an expectability or foreseeability factor.[4] *See id.*

The Texas Supreme Court has told us that there is not an accident when the action is intentionally taken and performed in such a manner that it is an intentional tort, regardless of whether the effect was unintended or unexpected. *See Argonaut Southwest Ins. Co. v. Maupin,* 500 S.W.2d 633, 635 (Tex. 1973) (finding that there was not an "accident" when the action was a trespass, the removal of soil from the wrong piece of real property, and the effect was the unintended and unexpected resulting hole in the wrong piece of real property); *Federated Mut. Ins. Co., v. Grapevine Excavation Inc.,* 197 F.3d 720, 723-24 (5th Cir. 1999) (discussing *Maupin*). We also know, however, that there is an accident when the action is intentionally taken, but is performed negligently, and the effect is not what would have been intended or expected had the action been performed non-negligently. *See Trinity Universal Ins. Co. v. Cowen,* 945 S.W.2d 819, 828 (Tex. 1997) ("accident includes the negligent acts of the insured causing damage which is undesigned and unexpected."); *Massachusetts Bonding & Ins. Co. v. Orkin Exterminating Co.,* 416 S.W.2d 396, 400 (Tex. 1967) (finding there was an accident when the action, the deliberate fumigation of a rice mill was performed negligently, and the effect was neither the intended nor the expected result had the fumigation been performed non-negligently); *Federated Mut. Ins. Co.,*

_____

[4]Hereinafter intent includes design and expectability includes foreseeability.

7

197 F.3d at 726 (finding there was an accident when the action, the deliberate instillation of parking lot fill material was performed negligently, and the effect was neither the intended nor the expected result had the instillation been performed non-negligently). In other words, if the act is deliberately taken, performed negligently, and the effect is not the intended or expected result had the deliberate act been performed non-negligently, there is an accident.

The Rices allege: 1) that Harken operated an oil facility on the Ranch; 2) that various lines, tanks, and wells have ruptured, leaked, and overflowed releasing pollutants, including saline substances, and continue to do so; 3) that the pollutants contaminated the Ranch's water, killed their cattle, destroyed vegetation, and generally damaged the Ranch and continue to do so; 4) that Harken negligently, carelessly, and wrongfully polluted the Ranch when it knew or should have known that such actions would cause damage; and 5) that Harken acted and is acting maliciously with subjective and actual awareness that its actions would cause property damage.[5] Applying the

_____

[5]The Federal Lawsuit's complaint, which is virtually identical to the State Lawsuit's petition states in pertinent part:

Pursuant to oil and gas leases, Harken operates an onshore oil facility on the Trust's land. Harken's facility consists of about 16 wells, storage tanks, tank batteries, pipelines, flowlines, saltwater lines, and other production and operation equipment.

Flowlines connecting Harken's wells and storage tanks ruptured and leaked on numerous occasions and continue to rupture and leak, spilling oil, saltwater, and other pollutants onto the Trust's land surface water, and ground water. Saltwater lines connecting Harken's saltwater tanks and injection wells ruptured and leaked many times and continue to rupture and leak, spilling saltwater and other pollutants onto the Trust's land, surface water, and groundwater. Harken's storage tanks overflowed and continue to overflow, spilling oil, saltwater, and other pollutants onto the Trust's land, surface water, and groundwater. Harken's wells have leaked and continue to leak both on the surface (for example stuffing-box leaks) and below the surface, contaminating the Trust's property, surface water, and ground water . . . .

Harken's releases damaged and continue to damage the Trust's land, contaminated and continue to contaminate navigable waters (including ground and surface water), killed cattle, and damaged and

8

Rices factual allegations to what the Texas Supreme Court has told us about accidents, we hold that the Rices alleged an accident. The operation of the oil facilities is the action deliberately taken, but alleged to have been performed negligently. The contaminated water, dead cattle. etc., caused by the pollutants, including saline substances, are the unintended and unexpected effects of the non-negligent operation of an oil facility.

The Appellants contend that the effect, the contaminated water, dead cattle, etc., is not unexpected because the contaminated water, dead cattle, etc., are the natural and probable consequences of operating an oil facility. We disagree. The Appellants offer no authority for the proposition that contaminated water, dead cattle, destroyed vegetation, and generally damaged

___

continue to damage vegetation. Harken polluted and continues to pollute upgradient from the Trust's land, and the runoff from the pollution had entered and continues to enter the Trust's land, damaging the surface, contaminating navigable waters (including ground and surface water), killing cattle, and destroying vegetation. Harken polluted and continues to pollute upgradient from the Trust's land, and the runoff from the pollution has entered and continues to enter the Trust's land, posing a substantial threat of discharge of oil, saltwater, and other pollutants into or upon navigable waters . . . Through its operations, Harken has damaged the surface, contaminated the water, destroyed vegetation, and killed cattle . . . .

Harken negligently and carelessly released and is negligently and carelessly releasing oil, saltwater, and other pollutants onto the Trust's land when it knew or should have known that doing so would damage the surface, contaminate the water, destroy the vegetation, and kill the cattle . . . . Corporately . . . Harken . . . by [its] negligent[] and careless[] [actions] . . . knew or should have known that . . .[its actions] would damage the surface, contaminate the water, destroy the vegetation and kill cattle. . . .The pollutants, oil, and saltwater negligently and wrongfully discharged by Harken physically entered the Trust's real property and severely damaged the surface, contaminated the water, destroyed vegetation, and killed cattle . . . .

Malice: Corporately . . . Harken acted and is acting maliciously. Harken . . . had and has had actual, subjective awareness of this risk but, nonetheless, proceeded and is proceeding with conscious indifference to the rights and welfare of the Trust. Corporately . . . Harken, acted and is acting with a flagrant disregard for the Trust's rights and with actual awareness that its wrongful conduct would in reasonable probability, result in property damage. Therefore, the Trust may recover exemplary damages from Harken . . . .

9

land are the natural and probable consequences of operating an oil facility non-negligently, nor have we found any. The Appellants argue that the Rices should have expected the contaminated water, dead cattle, etc., because the Rices alleged that the act of contaminating the water, killing the cattle, etc., was continuing–that is, the negligent performance of the deliberate action was continuing. We disagree. The Policies expressly state that property damage–for example, contaminated water, dead cattle, etc., can be caused by the "continuous or repeated exposure to a condition[.]" Moreover, according to the Texas Supreme Court we are supposed to focus on whether the effect is intended or expected not whether the negligent performance is intended or expected. *See Cowen,* 945 S.W.2d at 828; *Orkin Exterminating Co.,* 416 S.W.2d at 400. Thus, whether the Rices should have expected the negligent operation of the oil facility because it is continuing is irrelevant, if the deliberate operation of the oil facility, the act, is performed negligently and the effect, the resulting property damage, is not the intended or expected result of operating an oil facility non-negligently.

The Appellant, further, assert that the Rices failed to allege an occurrence because Harken's conduct cannot, at the same time, be both negligent and malicious or negligent and knowing. The Appellants argue that the factual allegations that charged malicious or knowing actions in effect transformed the factual allegations that charge negligent actions into malicious or knowing actions because the Rices did not plead malice or knowledge in the alternative. The fact that the Rices plead negligent, malicious, and knowing actions does not in and of itself transform the negligent actions into malicious or knowing actions, and there is nothing in the factual allegations to suggest that Harken's performance was not negligent. "If an insurer has a duty to defend any portion of a suit, the insurer must defend the entire suit." *Green Tree Corp.,* 249 F.3d

10

at 395. Thus, the Appellants must defend Harken against the entire suit including causes of action that would not alone trigger the duty to defend, regardless whether the complaint is pled in the alternative or not because the Rices's factual allegations of negligence are sufficient to trigger the duty to defend. *See St. Paul Ins. Co. v. Texas Dept. of Transp.,* 999 S.W.2d 881, 884 (Tex.App.–Austin 1999, pet. denied) ("[a]lthough the plaintiffs also allege gross negligence and intentional torts, this is not controlling because we must focus on the facts alleged, not the legal theories pleaded . . . that coverage may not be available for some causes of action pleaded does not relieve St. Paul of its duty to defend.").

      **2.12    The Rices alleged that the release of the pollutants was sudden and accidental.**

The Parties agree that "Exclusion (F)" in the Policies narrows the Appellants' initial duty to defend Harken against a suit alleging damages caused solely by the discharge, dispersal, release, or escape of pollutants, which would include saline substances, to suits that allege that such discharge, dispersal, release, or escape is sudden and accidental. Courts should construe exclusions "more stringent[ly]" than the other parts of an insurance policy or the factual allegations in the compliant. *See Barnett v. Aetna Life Ins. Co.,* 723 S.W.2d 663, 666 (Tex. 1987) ("because this case involves an exception or limitation on Aetna's liability under the policy, an even more stringent construction is required."). Additionally, Courts "must adopt the construction of an exclusionary clause urged by the insured as long as that construction is not itself unreasonable, even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties intent." *Id.*

The Rices alleged that the various lines, tanks, and wells ruptured releasing pollutants,

11

including saline substances. The word rupture intimates that the release was sudden. Therefore, since the release was sudden, and we have already determined that the pollution was the result of an accident, the Rices alleged that the release of the pollutants was sudden and accidental.

### 2.13 The Saline Clause obligates the Appellants to defend Harken against suits that allege property damage caused by saline substances.

The Parties agree that "Supplemental Exclusion Clause #11–Seepage, Pollution and Contamination" eliminates the limited duty the Appellants have to defend or indemnify Harken against a suit alleging damages caused solely by pollutants, which would include saline substances, regardless of whether the damage is sudden and accidental. The Parties, however, disagree as to the effects of the "Seepage and Pollution Endorsement" (hereinafter "S&P Endorsement") and the "Saline Substances Contamination Hazard Clause" (hereinafter "Saline Clause").

Harken maintains that the S&P Endorsement reinstitutes the Appellants' duty to indemnify it for damage caused by pollutants, which would include saline substances and that the Saline Clause reinstitutes the Appellants' duty to defend Harken in actions that allege damage caused by saline substances. Thus, according to Harken, the Appellants have a duty to defend it against an action that alleges that the damages were caused by saline substances and have a duty to indemnify it for the damages caused by pollutants, including saline substances.

On the other hand, the Appellants contend that the S&P Endorsement reinstitutes the duty to indemnify Harken for damage caused by pollutants, but not including saline substances. The Appellants, further, assert that the Saline Clause defines pollutants in the S&P Endorsement to include saline substances, though pollution, pollutants, or polluting appears nowhere in it, and merely extends the existing duty to indemnify Harken for damage caused by saline substances.

12

Thus, according to the Appellants, if they have a duty, it is solely a duty to indemnify Harken for damage caused by pollutants, which only by virtue of the Saline Clause, includes saline substances.

The policy can reasonably be read to support both the Appellants' and Harken's interpretation of the S&P Endorsement and the Saline Clause. "If multiple interpretations [of the policy] are reasonable, [we] must construe the [policy] against the insurer." *St. Paul Fire & Marine Ins. v. Green Tree Corp.,* 249 F.3d 389, 392 (5th Cir. 2001) (citation omitted); *see Barrnet,* 723 S.W.2d at 666; *Glover v. National Ins. Underwriters,* 545 S.W.2d 755, 761 (Tex.1977). Therefore, we adopt Harken's interpretation and hold that the Saline Clause reinstitutes the Appellant's duty to defend Harken against actions that allege an occurrence and damage caused by the sudden and accidental release of saline substances.

### 2.14    The property damage alleged occurred during the Policies' period.

The Policies state that the Appellants will defend Harken against a suit seeking damages for injury to tangible property if the injury "occurs during the policy period." The Appellants contend the property damage that the Rices alleged did not occur during either the Sphere Policy period or the Commercial Policy period. The only relevant reference in the complaint and petition that expressly refers to a date states:

> Harken's wrongful conduct is not an isolated incident or a one-time occurrence. A continuous succession of oil leaks and releases has resulted from Harken 's . . . negligence, and wrongful conduct, including the use of inadequate equipment without adequate monitoring. Releases and discharges have occurred at least 53 times, including occasions after Harken received notice from D. E. Rice in February 1997, after Harken received notice from the Trust's attorney on July 21, 1997, and after the

13

Trust filed this lawsuit.[6]

The Commercial Policy insured Harken from October 1, 1996 through October 1, 1997. A fair reading of the passage above suggests that at least some of the property damage that the Rices alleged occurred between February 1997 and July 1997. Therefore, the Rices alleged property damage that occurred during the Commercial Policy period.

The Sphere Policy insured Harken from October 1, 1995 through October 1, 1996. The complaint and petition are devoid of any express allegation that property damage occurred during the Sphere Policy period. This, however, does not end our inquiry.

The phrase "continuous succession of oil leaks and releases [which] has resulted from Harken's violations . . . at least 53 times, including occasions after . . . February 1997" alleges that Harken caused the property damage and presumes that at least some of that property damage, if not most, occurred before February 1997. In order for Harken to have caused the property damage, it must have been operating on the Ranch. In order for Harken to have been operating on the Ranch, it would have had to have a lease. Sphere does not dispute that Harken purchased the Lease from Momentum Operating Company, Inc., on December 15, 1995, but it contends that we may not consider when Harken purchased the Lease because that date is not in the complaint, petition, or Sphere Policy.

In *Western Heritage Ins. Co. v. River Entm't.,* a panel of this Court held that under Texas Law "when the petition does not contain sufficient facts to enable the court to determine if coverage exists, it is proper to look to extrinsic evidence in order to adequately address the issue."

---

[6]There is another reference date in the complaint, "[i]n 1996, the Trust granted a pipeline easement to Harken." Harken, however, did not raise this factual issue before the Dallas Court. Thus, it is waived.

998 F.2d 311, 313-15 (5th Cir. 1993), *citing State Farm Fire & Cas. Co. v. Wade,* 827 S.W.2d 448, 452-53 (Tex.App.–Corpus Christi 1992, writ denied). Thus, we can consider when Harken obtained the Lease. By doing so, it is fair conclude that the damage that the Rices alleged occurred during the Sphere Policy's period. Since the Rices alleged an occurrence and property damage caused by the sudden and accidental release of saline substance during the Policies' periods, the Appellants have a duty to defend Harken against the Lawsuits.

### 2.2 The Dallas Court's award of the Lawsuits' defense costs was not error.

Sphere contends that the Dallas Court awarded Harken "unreasonable" defense costs in the Federal Lawsuit and should not have awarded Harken defense costs in the State Lawsuit. Commercial does not appeal the Dallas Court's award of the Lawsuits' defense cost.

We review all issues of law with respect to a trial court's determination of damages *de novo*. *Boehms v. Crowell,* 139 F.3d 452, 459 (5th Cir. 1998). Absent an error of law, however, we review a trial court's award of compensatory damages, in the instant case the award of defense cost in the Lawsuits, a question of fact, for clear error. *Id.*

With respect to the award of the Federal Lawsuit's defense costs, Sphere argues that they are too high and that there is not sufficient documentation to justify the award. Sphere argues that labels such as "Legal Research" without an explanation of how it relates to the case is insufficient. In light of the deferential standard of review, the award should not be disturbed.

With respect to the defense cost awarded for the State Lawsuit, the Dallas Court awarded them *sua sponte*. Harken neither expressly amended its pleadings or its motion for summary judgment to include the State Lawsuit. Harken merely attached the State Lawsuit's petition and asked the court to enter a judgment that the Appellants had a duty to defend it in both Lawsuits.

15

In essence, the Dallas Court granted summary judgment *sua sponte* in favor of Harken on the duty to defend the State Lawsuit and awarded damages. Thus, triggering *de novo* review.

Federal District Courts are "empowered to enter summary judgment *sua sponte*," *Geraghty and Miller, Inc. v. Conoco Inc.,* 234 F.3d 917, 923 (5th Cir. 2001), "so long as the losing party has ten days notice to come forward with all of its evidence in opposition to the motion." *Love v. National Medical Enterprises,* 230 F.3d 765, 770-71 (5th Cir. 2000).

The State Lawsuit's original petition and the Federal Lawsuit's second amended complaint are virtually identical. Harken attached the State Lawsuit's original petition to its motion for entry of judgment. On March 9, 2000, Harken filed the motion. Sphere in its response, argued that the Dallas Court should not include the State Lawsuit's defense costs in the court's final judgment, but did not ask for an extension or a severance. On April 14, 2000, more than one month later, the Dallas Court entered its final judgment and awarded Harken, as damages, the Lawsuits' defense costs. Sphere had more than ten days to come forward with all of its evidence, it did not ask for an extension or severance, and made arguments against awarding the State Lawsuit's defense costs. For these reasons and the reasons articulated in Section 2.1 *supra*, the award of the State Lawsuit's defense costs was proper.

### 2.3     The Dallas Court's use of a 10% interest rate to calculate prejudgment interest was not error.

The Appellants contend that the Dallas Court erroneously used a 10% interest rate rather than a 6% interest rate when it calculated prejudgment interest. We review the award of prejudgment interest for an abuse of discretion. *Liberty Mut. Fire. Ins. Co. v. Canal Ins. Co.,* 177 F.3d 326, 339 (5th Cir. 1999).

6% is the appropriate prejudgment interest rate when the parties have unambiguously  and expressly established the amount owed under a contract, in the contract.  TEX. FIN. CODE. ANN. § 302.002 (Vernon 2000).  10% is the appropriate prejudgment interest rate when the parties have not unambiguously and expressly established the amount owed under a contract, in the contract.  TEX. FIN. CODE. ANN. § 302.003 (Vernon 2000).  Harken and the Appellants did not unambiguously and expressly establish the amount owed under the Policies, in the Policies.  Therefore, the use of the 10% interest rate was appropriate.

**3.      Conclusion.**

Based on the foregoing, we **Affirm** the Appellants' duty to defend Harken, the award of defense costs, and the use of the 10% interest rate to calculate pre-judgment interest.[7]

---

[7]Any issue not expressly addressed in this opinion was considered, but deemed to be without merit.