**NUTMEG INSURANCE COMPANY, Plaintiff,**

v.

**CLEAR LAKE CITY WATER AUTHORITY Defendant.**

No. CIV.A. 01–0435.

United States District Court, S.D. Texas, Houston Division.

June 10, 2002.

John H Marks, Jr, Locke Liddell & Sapp, Dallas, TX, for Nutmeg Insurance Company, plaintiff.

Barry Abrams, Ramon Gustave Viada, III, Abrams Scott et al, Houston, TX, William E Schweinle, Jr, William G Lowerre, Schweinle, Parish & Lowerre, PC, Houston, TX, for Clear Lake City Water Authority, defendant.

## MEMORANDUM AND ORDER OF PARTIAL SUMMARY JUDGMENT

HARMON, District Judge.

Pending before the Court in the above referenced action seeking a declaration that Plaintiff Nutmeg Insurance Company ("Plaintiff" or "Nutmeg") owes no duty to defend or indemnify Defendant Clear Lake City Water Authority ("Clear Lake") in an underlying suit, *Kirby Lake Development, Ltd., et al. v. Clear Lake City Water Authority,* Case No.1998–58185, pending in the 113th Judicial District Court of Texas, Harris County, Texas, is Plaintiff's motion for partial summary judgment (instrument # 32). Nutmeg contends that the three insurance policies at issue do not cover intentional breaches of contract, as alleged in the underlying suit, and that exclusions within the policies also exclude coverage for the claims in that state court action.

## STANDARD OF REVIEW

The movant seeking a federal summary judgment initially must inform the court of the basis for its motion and point out those portions of the pleadings, depositions, answers to interrogatories, and admissions on file that demonstrate the absence of a genuine issue of material fact and show that it is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The movant need not negate the opposing party's claims nor produce evidence showing an absence of a genuine factual issue, but may rely on the absence of evidence to support essential elements of opposing party's claims. *International Assoc. of Machinists & Aerospace Workers, Lodge No. 2504 v. Intercontinental Mfg. Co.,* 812 F.2d 219, 222 (5th Cir.1987). The burden then shifts to the non-movant to set forth specific facts and competent summary judgment evidence to raise a

genuine issue of material fact on each essential element of any claim on which he bears the burden of proof at trial. Fed. R.Civ.P. 56(c). The substantive law governing the suit identifies the essential elements of the claims at issue and therefore indicates which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The non-moving party may not rest on mere allegations or denials in its pleadings, but must produce affirmative evidence and specific facts. *Anderson*, 477 U.S. at 256–57, 106 S.Ct. 2505. It meets this burden only if it shows that "a reasonable jury could return a verdict for the non-moving party." *Id.* at 254, 106 S.Ct. 2505. A mere scintilla of evidence will not preclude granting of a motion for summary judgment. *Id.* at 252, 106 S.Ct. 2505.

All reasonable inferences must be drawn in favor of the non-moving party. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)., citing *United States v. Diebold*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). Once the burden of proof has shifted to the non-movant, it "must do more that simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586, 106 S.Ct. 1348. Instead it must produce evidence upon which a jury could reasonably base a verdict in its favor. *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.*, 477 U.S. at 249–50, 106 S.Ct. 2505. Moreover the non-movant must "go beyond the pleadings and by its own affidavits or by depositions, answers to interrogatories and admissions on file, designate specific facts that show there is a genuine issue for trial." *Webb v. Cardiothoracic Surgery Assoc. of North Texas, P.A.*, 139 F.3d 532, 536 (5th Cir.1998).

Unsubstantiated and subjective beliefs and conclusory allegations and opinions are not competent summary judgment evidence. *Grimes v. Texas Dept. of Mental Health and Mental Retardation*, 102 F.3d 137, 139–40 (5th Cir.1996); *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir.), *cert. denied*, 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994); *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir.), *cert. denied*, 506 U.S. 825, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992).

## APPLICABLE LAW

In Texas, the rules of construction of contracts generally are applicable to insurance policies. *Cicciarella v. Amica Mutual Ins. Co.*, 66 F.3d 764, 767–68 (5th Cir.1995), *citing Barnett v. Aetna Life Ins. Co.*, 723 S.W.2d 663, 665 (Tex.1987). The court construes the contract of the insurance policy as a whole and gives effect to the intent of the parties as expressed in the instrument. *Id.* at 768. Whether the terms are ambiguous is a question of law for the court. *Id.* A contract is ambiguous only "when its meaning is uncertain and doubtful or it is reasonably susceptible of more than one meaning." *Id., quoting Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). Only if the court decides that the contract cannot be given a certain and definite legal meaning, i.e., that it is ambiguous, is there a question of fact for the jury. *Id., citing Coker*, 650 S.W.2d at 393–94. If there is no ambiguity found by the court, it must interpret the meaning and intent of the insurance policy from the four corners of the document without the aid of extrinsic evidence. *Westchester Fire Ins. Co. v. Stewart & Stevenson Services, Inc.*, 31 S.W.3d 654, 658–59 (Tex.App.—Houston

[1st Dist.] 2000), *citing Carrabba v. Employers Cas. Co.*, 742 S.W.2d 709, 716 (Tex. App.—Houston [14th Dist.] 1987, no writ). When terms are defined in the policy, the policy's definitions control. *Trinity Universal Insurance Co. v. Cowan*, 945 S.W.2d 819, 823 (Tex.1997). Terms in a policy are given their ordinary and generally accepted meaning, unless there is an indication that the words were used in a technical or unusual sense. *Jarvis Christian College v. National Union Fire Ins. Co. of Pittsburgh, Pa.*, 197 F.3d 742, 746 (5th Cir. 1999). Insurance policies are construed liberally in favor of the insured. *Cicciarella*, 66 F.3d at 768, *citing Kelly Associates, Ltd. v. Aetna Cas. & Sur. Co.*, 681 S.W.2d 593, 596 (Tex.1984).

■ Texas applies the "eight corners" rule, i.e., comparison of the factual allegations of the underlying petition to the terms of the insurance policy only, to determine whether an insurer owes an insured a duty to defend, i.e., whether any part of the suit states a cause of action potentially covered by the policy. *National Union Fire Ins. Co. v. Merchants Fast Motor Lines, Inc.*, 939 S.W.2d 139, 141 (Tex.1997); *Lyons v. State Farm Lloyds and Nat. Cas. Co.*, 41 S.W.3d 201, 204 (Tex.App.—Houston [14th Dist.] 2001, writ denied). The petition's allegations are liberally interpreted and their truth presumed. *Id.* Where there is doubt whether the factual allegations state a cause of action that possibly falls within the scope of the policy's coverage, the doubt is resolved in favor of the insured. *Heyden Newport Chem. Corp. v. Southern Gen. Ins. Co.*, 387 S.W.2d 22, 26 (Tex.1965).

■ Nevertheless, to determine if the factual allegations are covered by the policy, the allegations must be at least sufficiently specific to "create the degree of doubt which compels resolution of the issue for the insured." *Merchants Fast Motor Lines*, 939 S.W.2d at 142. The court

should not imagine factual scenarios that might trigger coverage or read facts into the pleadings. *Id.*

■ If coverage is found for any part of a suit, the insurer must defend the entire suit. *St. Paul Ins. Co. v. Tex. Dep't of Transp.*, 999 S.W.2d 881, 884 (Tex. App.—Austin 1999, pet. denied). If the petition alleges facts that are not covered by or that are excluded by the insurance policy, the insurer has no duty to defend. *Fid. & Guar. Ins. Underwriters, Inc. v. McManus*, 633 S.W.2d 787, 788 (Tex.1982).

■ The duty to defend and the duty to indemnify are distinct and separate. *Trinity Universal Ins. Co. v. Cowan*, 945 S.W.2d 819, 821–22 (Tex.1997); *Saint Paul Surplus Lines Ins. Co. v. Geo Pipe Co.*, 25 S.W.3d 900, 903 (Tex.App.—Houston [1st Dist.] 2000, remanded pursuant to settlement). As noted, the duty to defend arises when the plaintiff alleges facts that potentially support claims for which there is coverage under the insurance policy and does not depend on the ultimate truth or falsity of those factual allegations. *Heyden Newport*, 387 S.W.2d at 24; *Saint Paul Surplus*, 25 S.W.3d at 903. The focus is not on legal theories, but on the facts alleged. *Saint Paul Surplus*, 25 S.W.3d at 903, *citing Maayeh v. Trinity Lloyds Ins. Co.*, 850 S.W.2d 193, 195 (Tex.App.—Dallas 1992, no writ).

■ The duty to indemnify arises from proven, adjudicated facts establishing liability in the underlying suit for damages that are covered by the policy in dispute. *Cowan*, 945 S.W.2d at 821; *Hartrick v. Great American Lloyds Ins. Co.*, No. 01–99–00215–CV, 2001 WL 870072, *3 (Tex. App.—Houston [1st Dist.] Aug.2, 2001). Thus no legal determination of ultimate liability is necessary before an insurer is obligated to defend a suit, but the insurer need only indemnify after the insured has been adjudicated to be legally responsible, whether by judgment or settlement. *Har-*

*trick,* 2001 WL 870072, *3; *Collier v. Allstate County Mut. Ins. Co.,* 64 S.W.3d 54, 61–62 (Tex.App.—Fort Worth, 2001), *citing Farmers Texas County Mut. Ins. Co. v. Griffin,* 955 S.W.2d 81, 82–83 (Tex.1997). An insurer may be found to have a duty to defend, but, if it is not found liable on the claims within the scope of the policy, it has no duty to indemnify. *Griffin,* 955 S.W.2d at 82.

Furthermore, if there is no duty to defend, there can be no duty to indemnify. *Id.* In addition, "the duty to indemnify is justiciable before the insured's liability is determined in the liability lawsuit when the insurer has no duty to defend and *the same reasons that negate the duty to defend likewise negate any possibility that the insurer will ever have a duty to indemnify* [emphasis in the original]." *Farmers Texas County Mutual Ins. Co. v. Griffin,* 955 S.W.2d 81, 84 (Tex.1997). *See also Thom v. State Farm Lloyds,* 10 F.Supp.2d 693, 703 (S.D.Tex.1997). In such a circumstance, a court has jurisdiction to decide an insurer's duty to defend and to indemnify even where the judgment rendered against the insured in the underlying lawsuit is not final. *American States Ins. Co. v. Bailey,* 133 F.3d 363, 368 (5th Cir.1998), *citing Western Heritage Ins. Co. v. River Entertainment,* 998 F.2d 311, 315 (5th Cir.1993).

An insurer's duty to defend is generally determined by examining the allegations in the most recent pleadings of the underlying suit and the language of the insurance policy. *Harken Exploration Co. v. Sphere Drake Ins. PLC,* 261 F.3d 466, 471 (5th Cir.2001). Under Texas law, the insured bears the burden of demonstrating that its claim is potentially within the insurance policy's scope of coverage. *Id.; Employers Cas. Co. v. Block,* 744 S.W.2d 940, 944 (Tex.1988), *rev'd on other grounds, State Farm Fire & Cas. Co. v. Gandy,* 925 S.W.2d 696, 714 (1996). If

there is any question whether the petition's allegations fall within the policy's scope of coverage, that doubt must be resolved in favor of the insured, as the insured's claim need only be "potentially" within the scope of coverage. *King v. Dallas Fire Ins. Co.,* 27 S.W.3d 117, 120 (Tex.App.—Houston [1st Dist.] 2000) (review granted, May 24, 2001).

In Texas the insurer bears the burden of demonstrating that the allegations in the petition are excluded from coverage by applicable exclusions in the policy at issue. *Hartrick v. Great American Lloyds Ins. Co.,* 62 S.W.3d 270, 274 n. 6 (Tex.App.—Houston [1st Dist.] 2001) (Rule 53.7(f) motion filed Feb. 20, 2002), *citing* Tex. Ins.Code Ann. art. 21.58b (Vernon Supp.2001). *Id.* Policy exclusions are to be narrowly construed. *National Fire Ins. Co. of Pittsburgh, Pa. v. Hudson Energy Co., Inc.,* 811 S.W.2d 552, 555 (Tex.1991) ("Exclusions or limitations on liability are strictly construed against the insurer and in favor of the insured" and "an intent to exclude coverage must be expressed in clear and unambiguous language"). If the insurer succeeds in showing that an exclusion applies to the petition's claim, the burden shifts back to the insured to show that an exception to the exclusion brings the claim against it potentially within the scope of coverage under the policy. *Harken,* 261 F.3d at 471.

In Texas, the doctrines of waiver and estoppel cannot be applied to create coverage where none exists under the terms of the policy. *Paradigm Ins. Co. v. Texas Richmond Corp.,* 942 S.W.2d 645, 652 (Tex.App.—Houston [14th Dist.1997], writ denied). An exception to this rule has been recognized. *Id.* If an insurer has knowledge of facts indicating non-coverage of the claims against its insured, yet the insurer assumes or continues the defense of its insured without obtaining a reservation of rights or a non-waiver agreement,

the insurer waives all policy defenses, including that of non-coverage, or it may be estopped from raising these defenses. *Farmers Texas County Mutual Ins. Co. v. Wilkinson*, 601 S.W.2d 520, 522 (Tex.Civ. App.—Austin 1980, writ ref'd n.r.e.); *State Farm Lloyds Inc. v. Williams*, 791 S.W.2d 542, 550 (Tex.App.—Dallas 1990, writ denied). Nevertheless, to demonstrate that the exception applies, the insured must show that it was harmed, i.e., prejudiced, by the insurer's conduct. *Id.*

## NUTMEG'S MOTION FOR PARTIAL SUMMARY JUDGMENT (# 31)

Plaintiff's motion for partial summary judgment [1] states that the underlying state court suit, which asserted causes of action for (1) breach of contract or alternatively for (2) quantum meruit, and (3) an unconstitutional taking under the Texas Constitution, was brought by four Claimants, who are developers of residential housing developments within the boundaries of Clear Lake: Kirby Lake Development, Ltd. ("Kirby"), Miter Development Company, L.P. ("Miter"), Taylor Lake Ltd. ("Taylor"), and University Development, Inc. ("University"), (collectively, "Claimants"). According to the Fifth Amended Original Petition,[2] Clear Lake is "a water control and improvement district that was created pursuant to the provisions of the Texas Constitution." Ex. E(6) at 1 to Nutmeg's motion.

Claimants in the underlying suit asserted that they each entered into a contract with Clear Lake to purchase the water, sewer and drainage facilities that Claimants had developed, in accordance with state regulations. They alleged that Clear Lake breached the four contracts (Exs.F(1)-(4)), which required Clear Lake to purchase the facilities "as soon as possible" and to not "unreasonably withhold" its consent or approval to sell revenue bonds or to allocate available funds to pay for the facilities constructed by these Claimants in the housing developments.[3] Claimants maintain that Clear Lake failed to satisfy its contractual obligations to purchase the facilities; specifically Clear Lake refused to sell revenue bonds or allocate funds, and argued that it had no duty to do so because the bond propositions before the voters relating to the purchase of the facilities failed. Claimants charge that the bond propositions failed because Clear Lake canceled a scheduled bond election, actively worked to defeat a second bond election, and then did not support a third.

Alternatively Claimants sued for quantum meruit [4] on the grounds that Clear Lake accepted and used Claimants' ser-

---

[1] The motion does not address the remaining issues: reimbursement of attorneys' fees and expenses in this action and the underlying suit, costs of court, and pre- and post-judgment interest.

[2] The copies of Claimants' five petitions (Nutmeg's Exs. E(1)-(6)) submitted by Defendants reflect that Claimants added and deleted various claims during the course of the underlying litigation. Because the Fifth Amended Petition (Ex. E(6)) supersedes the others, the Court has generally focused on that document. Nevertheless, one relevant exception is that prior to the final pleading, Claimants asserted a claim for fraud, misrepresentation and/or statutory fraud in their four previous petitions. The issue of Nutmeg's duty to de-

fend would relate to these claims while they were pending.

[3] According to the controlling petition, Clear Lake could effect the purchase of the facilities "as soon as possible" in three ways: sell voter-approved tax and revenue bonds; sell revenue bonds that did not need voter approval; or use funds available in its accounts.

[4] Claimants' Fifth Amended Petition, Ex. E(6) at 9, addressing potential defenses of Clear Lake, alleges quantum meruit as an alternative theory to breach of contract, as follows in relevant part:

32. The Water Authority claims that the Sales Agreements are void to the extent that

vices and facilities without paying Claimants for them.

As a third cause of action, Claimants alleged that Clear Lake's "utilization of, and exercise of dominion and control over, the Facilities, in whole or in part," constituted an unconstitutional taking/inverse condemnation without compensation under Article I, Section 17 of the Texas Constitution. E(6) at par. 36.

In addition, Claimants sought a writ of mandamus to compel Clear Lake to purchase the water, sewage and drainage facilities as quickly as possible; a judicial declaration that Clear Lake was obligated to purchase these facilities as soon as possible with funds allegedly on hand in Clear Lake's Capital Projects Fund; and, to the extent that Clear Lake failed to comply with the Open Meetings Act, ratification of the contracts, reformation of the contracts, and estoppel of Clear Lake's denial of the enforceability of selected contracts.

On March 2, 2001 a jury verdict was rendered in favor of Claimants against Clear Lake for more than $1.5 million. Ex. D to Nutmeg's motion. On July 18, 2001 the state court entered a Reformed Final Judgment granting relief on Claimants' breach-of-contract claims and request for attorney's fees.[5] Ex. G. The judgment is currently on appeal.

Nutmeg represents that it is undisputed that on the same date that Claimants filed the underlying suit, December 8, 1998, Clear Lake gave notice of the claims to Nutmeg, which accepted the notice and agreed to investigate the suit and to provide and pay for a defense by an attorney selected by Clear Lake under a strict reservation of rights in a letter dated December 15, 1998. Exs. H & I.[6]

---

they require a future Board of the Water Authority to effect the purchase of the Facilities. Additionally the Water Authority claims enforcement of the Sales Agreements is barred by the "separation of powers" doctrine because they believe that the Court does not have the power to enforce the Sales Agreements. While Plaintiffs believe those claims of the Water Authority are ludicrous, Plaintiffs are entitled to quantum meruit damages (the reasonable value of the services and materials at the time performed) to the extent that the Court finds the Sales Agreements are void or unenforceable."

33. In the alternative, if, as the Water Authority also contends, it has no obligation to purchase the Facilities until (and if) there are voter-approved tax bonds, then the Sales Agreements are void because they are illusory and fail for consideration, entitling Plaintiffs to quantum meruit damages.

34. Plaintiffs are further entitled to *quantum meruit* damages because the contracts have been abandoned or partially performed without fault of Plaintiffs.

5. Specifically the Reformed Final Judgment awarded in actual damages for breach of contract $363,244 to University, $748,675 to Kirby, $510,000 to Taylor, and $74,252 to Miter. It also awarded attorney's fees for $322,014.75, and an additional $30,000 if appeal was taken to an intermediate court of appeals, and $10,000 for appeal to the Texas Supreme Court. Ex. G. The judgment also ordered that Claimants take nothing on their quantum meruit claim. *Id.*

6. The letter, Ex. H, stated in relevant part that the insurer had recently received the lawsuit papers and

We accept notice of this claim and will proceed with the investigation into coverage for this matter under a strict reservation of rights.

In review of the allegations made part of this lawsuit, we note that plaintiffs are seeking various injunctive and administrative relief, which we believe is not covered under the policy issued to our insured. There is a question as to whether any of the allegations fall within coverage under our policy, and we are proceeding with our investigation into those issues.

We will proceed with our investigation on the condition that none of our actions or inactions will serve to constitute a waiver of any of our rights under said policy. We expressly reserve our right to disclaim coverage for this matter at a later date. . . .

Clear Lake objects that this letter is not a "reservations of rights" letter, and certainly

Nutmeg had issued to Clear Lake three policies which are the focus of the instant declaratory judgment action: an errors and omissions policy, a public entity commercial liability policy, and an excess liability policy, one or more of which, Clear Lake argues, provide coverage for the underlying suit. Exhibits A–C to Plaintiff's motion for partial summary judgment. Nutmeg insists that as a matter of law both the terms of the three policies and the policies' exclusions clearly bar coverage for the underlying suit. More specifically, urges Nutmeg, because the underlying suit arises from an alleged intentional breach of several contracts to purchase water and sewage facilities through bond funding, and because as a matter of law the policies do not cover intentional breaches of contract, but only fortuitous acts, and because exclusions in the policies also exclude coverage of Claimant's petition's allegations, Nutmeg is entitled to summary judgment as a matter of law. Nutmeg asks the Court to declare that it does not owe a duty to defend nor a duty to indemnify Clear Lake for the claims raised in the underlying action.

The Public Officials Errors and Omissions Policy (the "E & O Policy"), with a limit of $2,000,000 per occurrence and $2,000,000 in the aggregate, was in effect from October 1, 1998 through October 1, 1999 and provided coverage for amounts for which Clear Lake "shall become legally obligated to pay as damages because of errors or omissions injury . . . ." that were caused by an "occurrence." Ex. A at 1.[7] "Damages" in the context of the E & O Policy means "monetary judgment, award or settlement." *Id.* at 3. The policy defines "errors or omissions injury" as "injury or damage that arises out of an insured's rendering of or failure to render service within the scope of your facilities or operations including but not limited to: a. Discrimination, not committed by or at the insured's direction, when insurance therefore is permitted by law; b. False or improper service of process; and c. Violation of civil rights." *Id. at 3–4* It defines "occurrence" for purposes of the E & O Policy as "an act, error or omission in the conduct of your facilities or operations not listed as 'excluded' in the Schedule of Included/Excluded Facilities or Operations or covered pursuant to the terms of the Schedule relating to additional exposures." *Id.*

Furthermore the E & O Policy contains *inter alia* the following exclusions from coverage: (1) "Liability arising out of any

---

not a "strict" reservation. Response (# 40) at 3. It further complains that certain representations in Nutmeg's motion are incorrect: paragraph 4 is erroneous because it quotes provisions of the contracts out of context; paragraphs 11–12 because a portion of the statements are "wrong" (i.e., no brief has been filed in the appeal of the state court litigation because Clear Lake is awaiting completion of the trial record); Nutmeg's suggestion that the underlying suit was purely a breach of contract action; and Nutmeg's entire claim of "undisputed facts," which Clear Lake challenges as unsupported by affidavit. Because Nutmeg has provided copies of the complete policies as summary judgment evidence, the Court finds that Clear Lake's objection to quoting specific provisions for discussion is meritless. Moreover, Nutmeg has not concealed the fact that the state court judgment is on appeal. Nutmeg's motion at 7. Furthermore, while the parties' interpretations of the claims in the underlying suit may differ, the documents from the underlying suit, submitted with Nutmeg's motion, speak for themselves. The Court notes that Clear Lake does not object to the authenticity of the summary judgment evidence attached to Nutmeg's motion.

7. Because pages of copies of the E & O Policy and the Liability Policy, Exs. A and B to Nutmeg's motion, were of poor quality and were not organized in the way in which they were issued, Nutmeg moved for and was granted leave to substitute true and correct copies (# 33 and attachments; # 36).

dishonest, fraudulent, criminal or malicious act or omission of any insured," *id.* at 2; (2) "Liability arising out of any insured obtaining remuneration or financial gain to which such insured was not legally entitled; but only as respects such insured," *id.;* (3) "Any liability arising out of or in any way connected with the principles of eminent domain, condemnation proceedings or inverse condemnation, adverse possession or dedication by adverse use or whatever name called, whether such liability accrues directly against any insured or by virtue of any agreement entered into by or on behalf of any insured," *id.;* (4) "Liability arising out of the purchase, sale, marketing, issuance or retirement of bonds or other debt instruments by any insured," *id.* at 9, by an endorsement to the E & O Policy entitled, "Exclusion—Bonds or Other Debt Instruments," Form EO 21 07 10 91; and (5) "Liability assumed by any insured under a contract or agreement," *id.* at 3.

The second policy at issue, the Public Entity General Liability Policy ("the Liability Policy"), No. 61 CEN QL8712, covered occurrences during the same one-year period as the E & O Policy for "sums which the insured shall become legally obligated to pay as damages because of 'bodily injury,' 'property damage,' 'advertising injury,' 'personal injury,' or 'employee benefits injury' . . ." if the bodily or property injury was caused by an "occurrence" or if the advertising injury, personal injury or employee benefits injury was caused by an "offense." Ex. B at 1 to Nutmeg's motion.

The Liability Policy defines the following key terms, *inter alia,* in relevant part:

. . . . .

"Advertising injury" means injury arising out of one or more of the following "offenses" committed in the course of advertising your goods, products or services:

a. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

b. Oral or written publication of material that violates a person's right of privacy;

c. Misappropriation of advertising ideas or style of doing business; or

d. Infringement of copyright, title or slogan.

. . . . .

"Bodily injury" means bodily injury, sickness or disease sustained by a person, including mental anguish or death resulting from any of these at any time.

. . . . .

"Employee benefits injury" means injury that occurs during the "policy period" and arises out of any act, error or omission in the "administration" of your "employee benefit programs".

. . . . .

"Occurrence" means, with respect to "bodily injury" or "property damage," an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

"Offense" means, with respect to:

a. "Advertising injury," an offense described in the definition of advertising injury; and

b. "Personal injury," an offense described in the definition of personal injury; and

c. "Employee benefits injury," an act, error or omission described in the "administration" of your "employee benefits programs."

. . . . .

"Personal injury" means injury, arising out of your business, other than "bodily

injury" or "advertising injury," arising out of one or more of the following "offenses:"

a. False arrest, detention or imprisonment;

b. Malicious prosecution;

c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor;

d. Oral or written publication of a material that slanders or libels a person or organization or disparages a person's goods, products or services; or

e. Oral or written publication of material that violates a person's right of privacy.

. . . . .

"Property damage" means:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

. . . . .

Ex. B at 13–16.[8]

The Liability Policy also contains several exclusions that preclude coverage for the underlying suit, insists Nutmeg: (1) "Injury or damage arising out of or in any way connected with the principles of eminent domain, condemnation proceedings or Inverse condemnation or adverse use by whatever name called, whether such liability accrues directly against the Insured, or

on behalf of the insured," *id.* at 7; (2) Liability arising out of or in connection with "[t]he purchase, sale, marketing, issuance or retirement of bonds or other debt instruments by any Insured," *id.* at 6; (3) Advertising injury arising out of a "[b]reach of contract, other than misappropriation of advertising ideas under an implied contract," *id.* at 5; and (4) Personal injury or advertising injury "[f]or which the Insured has assumed liability in a contract or agreement," *id.*

The Excess Policy, No. 61 PSN SA 9921 applied to occurrences between October 1, 1998 to October 1, 1998 that resulted in liability in excess of $2,000,000 in the aggregate for damage awards that Clear Lake becomes legally obligated to pay based on any injury or damage covered by the underlying E & O Policy and Liability Policy and not excluded or modified by the exclusions, conditions, definitions or any other terms of the Excess Policy. Ex. C at 1 and "Claims Made Limitation Endorsement" to Nutmeg's motion.

Nutmeg then develops and supports with legal authority and documentary evidence each of these arguments.

Nutmeg contends that it does not have a duty to defend or indemnify Clear Lake under the policies for liability in the underlying suit and is entitled to partial summary judgment because the policies do not, and were never intended to, cover intentional breaches of contract; instead they were intended to cover fortuitous acts. It further maintains that the policies' exclusions exclude coverage for Claimants' claims.

█ "Focusing on Texas law, Nutmeg argues that liability insurance policies are intended to provide coverage only for

---

**8.** The Court has quoted from the policy rather than Nutmeg's motion, which contains some inaccuracies.

fortuitous, unforeseeable events, and not for the foreseeable results of an insured's deliberate conduct, which would include a breach of contract. *Two Pesos, Inc. v. Gulf Ins. Co.,* 901 S.W.2d 495, 501 (Tex. App.—Houston [14th Dist.] 1995, no writ) ("fortuity is an inherent requirement of all risk insurance policies"). Moreover, commercial general liability policies cover only tort-based claims resulting from an accident, not claims sounding in contract law. *See, e.g., Data Specialties, Inc. v. Transcontinental Ins. Co.,* 125 F.3d 909, 911–13 (5th Cir.1997) ("[W]e conclude that a Texas court would rule that the CGL policy language 'legally obligated to pay as damages' applies only to tort-based obligations."); *Gibson & Assoc., Inc. v. Home Ins. Co.,* 966 F.Supp. 468, 474 (N.D.Tex. 1997) ("coverage simply does not exist when an insured becomes obligated to pay damages incurred by a third party because of the insured's own breach of contract . . . .").

Nutmeg argues that the same rule should apply to an errors and omission policy because it is another kind of liability coverage that generally protects against professional liability for an insured's failure to comply with the standard of care for his profession, or, in other words, for his failure to perform in a reasonable manner based upon his training and expertise. *See* Lee R. Russ & Thomas F. Segalla, *Couch on Insurance 3d* § 1.35 (3d ed.1997) (hereinafter *"Couch "*) and *id.* at § 1.35 n. 20 (Supp.2001) ("An 'errors and omissions policy' is a form of professional liability insurance designed to insure certain classes of professionals from risks such as negligence; in essence, the policy is a form of malpractice insurance."). Nutmeg argues that Clear Lake erroneously attempts to make these liability policies provide the same protections as a performance bond, suretyship or guarantee. *Couch* at § 1.18 makes clear there are major distinctions between the risks covered by the two:

> The nature of the risk assumed by the party in the role of "insurer" is a major distinction between insurance and the arrangement of guaranty and surety. As a broad general rule, the risk can be characterized in terms of the degree to which the contingency is within the control of one of the parties. In the classic instance of insurance, the risk is controlled only by chance or nature. In guaranty or surety arrangements, the risk tends to be wholly or partially in the control of one of the three parties. Whether a criminal defendant released under a bail bond appears at trial, for example, is entirely within the defendant's control. Similarly, whether a construction contractor defaults on a contractor's bond is partly within the contractor's control (he may simply choose not to finish construction or pay a materialman) . . . .

In the same vein, the E & O and Liability Policies here, using the same language, provide coverage solely for sums which Clear Lake "shall become legally obligated to pay as damages." The Fifth Circuit has held that this language, "shall become legally obligated to pay as damages," excludes breach of contract damages. *Data Specialties,* 125 F.3d at 911–13 (phrase "applies only to tort-based obligations").[9] Nutmeg emphasizes that the allegations in the governing petition all arise from conduct allegedly in breach of the four contractual agreements and that the final

---

**9.** The Fifth Circuit in this case was not addressing an E & O policy, but a CGL policy. Because Nutmeg presents no case law, nor has the Court found any, supporting its arguments, this Court is unwilling to conclude that the rule against coverage in general liability policies for actions voluntarily and intentionally undertaken by the insured to error and omissions policies where the action is wholly or partly within the control of the insured.

judgment with its damages award in the underlying suit was based on the finding that Clear Lake breached the contracts.[10] Thus the policies do not cover these claims, Nutmeg concludes.

■■■ Nutmeg also argues that there is no coverage under the E & O Policy because Claimants have not alleged the underlying suit arises from an "errors or omissions injury" (defined in the policy as an "injury or damages that arises out of [Clear Lake's] rendering of or failure to render service · within the scope of [its] facilities and operations"). Ex. A at 3. According to *Black's Law Dictionary* at 1372 (7th ed.1999), the ordinary and general meaning of "service" is "the act of doing something useful for a person or company for a fee." Nutmeg observes that Claimants did not allege that Clear Lake is liable for the failure to perform a service in the underlying suit, but only for failure to pay for Claimants' services, not for Clear Lake's own services. The judgment was based on that failure to pay.[11] Nutmeg maintains it had no duty to defend or to indemnify Clear Lake in the underlying suit under the E & O Policy.

Nor, insists Nutmeg, did Claimants allege that Clear Lake engaged in conduct constituting an "occurrence," i.e., "an act, error or omission in the conduct of [Clear Lake's] facilities or operations" that has not expressly been "excluded" under the E & O Policy. Ex. A at 4. The E & O Policy covers and triggers Nutmeg's duty to defend Clear Lake only against claims for damages arising from Clear Lake's operations generally or from the operations of Clear Lake's facilities. In contrast, Claim-

ants alleged that Clear Lake failed to pay Claimants for Claimants' services·in developing and/or constructing the facilities, activity that does not fall within the .scope of the policy's coverage. Ex. E(6) at pars. 15–17, 24–34. Nor do the claims arise from Clear Lake's operations in general. Texas courts have defined "operations" as "doing or performing action; work; a deed; ... To perform a work or labor; ... to work." *Pan Am. Ins. Co. v. Cooper Butane Co.*, 157 Tex. 102, 300 S.W.2d 651, 654–55 (1957). Nutmeg argues that Claimants' allegations do not arise from Clear Lake's "operations," but rather from a failure to comply with the contracts' terms to purchase Claimants' facilities and pay for services rendered by Claimants "as soon as possible." Ex. E(6) at pars. 15–17. Thus Nutmeg concludes that Claimants have failed to allege an "occurrence" triggering Nutmeg's duty to defend.

■■■ The Court finds that "operations" is not defined in the policy and it is unclear whether with respect to this suit it would include what Claimants have alleged was "[t]he official written policy, and normal practice and procedure" of Clear Lake to purchase developers' water facilities (Ex. E(6) at par. 8) or working to obtain funding for the purchases of developers' water facilities. That ambiguity must be construed in favor of the insured.

Nutmeg further contends that because the judgment in the underlying suit awards damages for Clear Lake's same alleged failure to purchase facilities from Claimants under the contracts, there is also no duty to indemnify.

---

**10.** Nevertheless, as indicated under "APPLICABLE LAW," the Court must determine whether Nutmeg had a.duty to defend not from the express causes.of action alleged or those found by the court or jury in the underlying suit, but from the factual allegations and any potential claims raised by those factual allegations, whether true or not.

**11.** The Court emphasizes that this argument is erroneous because the duty to defend is not predicated on the judgment in the underlying suit, but on whether Claimants' factual allegations in that suit can give rise to a potential claim within the scope of coverage of the policies.

Moreover, as noted, the E & O Policy provides coverage only for sums that Clear Lake "shall become legally obligated to pay as damages because of errors or omissions injury to which [this policy] applies." Ex. A at 1. The E & O Policy defines "damages" as "a monetary judgment, award or settlement that does not include fines or penalties or damages for which insurance is prohibited by law applicable to the construction of this policy." Ex. A at 3. Nutmeg asserts that Claimants' request for declaratory relief and mandamus do not constitute "damages" under the policy and therefore Nutmeg had no duty to defend or indemnify as to those claims.

Furthermore, Nutmeg contends that the E & O Policy's exclusion for inverse condemnation and for liability "connected in any way" with the principles of inverse condemnation precludes coverage for Claimants' unconstitutional taking cause of action and for the claims connected to and interrelated with the alleged taking, i.e., for Clear Lake's alleged refusal to pay for water facilities built by the Claimants. Nutmeg maintains that to demonstrate that a claim is "connected with," "related to," "interdependent with" or "arising from" an excluded act, one must show that the injury would not have existed but for the excluded act. For instance, in a case in which the Fifth Circuit found that a provision in liability policies excluding coverage for sexual misconduct also negated coverage relating to other alleged injuries, the Fifth Circuit stated,

> This court has held that the words "arising out of," when used in an insurance policy, are "broad, general and comprehensive terms effecting broad coverage." *Red Ball Motor Freight, Inc. v. Employers Mut. Liab. Ins. Co.,* 189 F.2d 374, 378 (5th Cir.1951). The words are "un-

derstood to mean 'originating from,' 'having its origin in,' 'growing out of' or 'flowing from.' " *Id.; see also Continental Cas. Co. v. City of Richmond,* 763 F.2d 1076, 1080–81 (9th Cir.1985) (applying *Red Ball* 's interpretation of "arising out of," and "concluding that a claim need only bear an incidental relationship" to the excluded injury for the policy's exclusion to apply.) Without [the insured's] sexual misconduct, [the plaintiffs] would have no claims [for negligence] against [the other defendants]. Every alleged harm caused to [the plaintiffs] by [the defendants] stems from and is integrally related to [the insured's] acts.

*Od.* at 370; *see also Scottsdale Ins. Co. v. Texas Sec. Concepts & Investigation,* 173 F.3d 941, 943 (5th Cir.1999) (noting that phrase "arising out of" means that "a claim need only bear an incidental relationship to the described conduct for the exclusion to apply."); *New York Life Ins. Co. v. Travelers Ins. Co.,* 92 F.3d 336, 339–40 (5th Cir.1996) ("A claim against a principal is 'related' to and 'interdependent' on a claim against an agent if the claim against the principal would not exist absent the claim against the agent"; with respect to claims in an underlying state court suit filed by New York Life Insurance Company alleging fraud, negligent hiring, training, and supervision of employees that defrauded New York Life Insurance Company's employees, holding that the employee's underlying acts were not an "occurrence" under the policy issued by Travelers Insurance Company because they were intentional and fraudulent, and that the negligence claims were not covered because they were related to, interdependent on, and inseparable from the insured's fraudulent conduct); [12] *Columbia Mut. Ins. Co. v.*

---

**12.** This holding is partly erroneous under Texas law. A recent opinion from the Texas Supreme Court rejects the Fifth Circuit's ap-

plication of the "related and interdependent rule" as Texas law where the Fifth Circuit has

*Fiesta Mart, Inc.*, 987 F.2d 1124 (5th Cir. 1993).

Nutmeg analogizes that the same concept is applicable to the alleged conduct falling within the ambit of "inverse condemnation." Nutmeg argues that given the petition's allegations, no breach of contract would have occurred and no attorneys' fees would have been recoverable if Clear Lake had not "taken" Claimants' property without just compensation. Nor would the allegation that Clear Lake enjoyed services and materials without paying for them have arisen if Clear Lake had not committed the taking. Nutmeg concludes that Claimants' claims for breach of contract, quantum meruit and attorneys' fees arise out of and are intertwined with their cause of action for inverse condemna-tion and therefore Nutmeg does not owe a duty to defend or indemnify Clear Lake. *Cf. Scottsdale*, 173 F.3d at 943.

Nutmeg also points to the exclusion for liability arising out of the purchase, sale, marketing, issuance or retirement of bond in the E & O Policy. Nutmeg contends that it not only excludes from coverage Claimants' allegations that Clear Lake refused to use surplus bond proceeds to purchase Claimants' facilities, actively encouraged voters to reject the May and October 1998 bond proposals, and consistently marketed the bond proposal in a manner designed to ensure the failure of each proposal, but that the exclusion also precludes Claimants' causes of action for breach of contract, quantum meruit and attorney's

wrongly concluded that an insured employer does not owe a duty to defend where his employee's tortious act was intentional and therefore not an "occurrence" within the meaning of the insurance policy because the claims against the employer for negligent hiring, supervision and training are derivative from the underlying intentional conduct. In *King v. Dallas Fire Insurance Company*, No. 00–1152, 2002 WL 1118438, *4–5 (Tex. May 30, 2002).

In *King*, one of King's employees intentionally attacked a person who subsequently sued King, the employer, on a theory of respondeat superior liability and for negligent hiring, training and supervision of the employee. King sought to enforce the duty to defend in a commercial liability policy issued by Dallas Fire Insurance Company. (In *King*, unlike here, there was a separation-of-insureds provision that explicitly established separate policies for King and its employee, but each policy stated that the insureds were to be treated "[a]s if each Named Insured [King] were the only Named Insured," i.e., as if King were the only insured. *Id.* at *2.) At issue before the high court was "whether an employer's alleged negligent hiring, training and supervision constitute an 'occurrence' under the terms of the policy even though the injury was directly caused by the employee's intentional act." *Id.* at *1. The Texas Supreme Court rejected the Fifth Circuit's application of the

"related to and interdependent rule" to deny the existence of duty to defend because the negligence claims against the employer derived from the intentional tortious acts of the employee and therefore there was no "occurrence." *Id.* at *4. Instead, the Texas Supreme Court held that the district court must examine the plaintiff's pleadings' allegations and the policy's language from the *insured's* standpoint and not attribute to the insured the employee-assaulter's intent. *Id.* at *5. It expressly stated that

the Fifth Circuit's rule improperly imputes the actor's intent to the insured. That is to say, whether one who contributes to an injury is negligent is an inquiry independent from whether another who directly causes the injury acted intentionally. Essentially the actor's intent is not imputed to the insured in determining whether there was an occurrence.

*Id.* The Texas Supreme Court concluded there was an "occurrence," invoking the insurer's duty to defend.

The holding in *King* is not applicable here because Claimants' causes of action are solely against Clear Lake, itself. Nevertheless Nutmeg's global argument of no coverage for any claim that is "connected with," "related to," "interdependent with" or "arising from" an excluded act that existed only because of the excluded act should be qualified as a matter of law.

fees because they are connected with the purchase, sale and issuance of bonds.

In addition, Nutmeg highlights the E & O Policy's exclusion for liability arising out of the insured's obtaining remuneration or financial gain to which the insured was not legally entitled. Ex. A at 2. Nutmeg points to allegations in the underlying suit that Clear Lake retained money in its Capital Projects Fund to which it was not legally entitled because of the requirements of the contracts at issue. In particular Nutmeg notes Claimants' complaints that Clear Lake had "the money sufficient to pay the monies due and owing to [the Claimants] for the purchase of the [f]acilities" and refused to use those funds to comply with its contractual obligations to pay Claimants "as soon as possible." Ex. E(6) at par. 23. Claimants also assert that they "provided valuable, compensable services and materials" to Clear Lake that it "accepted, used and enjoyed" without paying for those services and materials. Ex. E(6) at par. 31. Thus the nonpayment constitutes enjoyment of financial gain, and Nutmeg has no duty to defend or indemnify Clear Lake in the underlying suit. Nutmeg maintains that the remuneration/financial gain exclusion applies to exclude these claims. *See, e.g., Jarvis*, 197 F.3d at 747–49.

Furthermore, according to Nutmeg, the E & O Policy's exclusion for fraud (Ex. A at 2) excludes the allegations in Claimants' Original, first amended, second amended, and third amended petitions' allegations, since dropped, that Clear Lake engaged in fraud or misrepresentation in repeatedly assuring Claimants that funds would be available from the 1989 bond election to purchase the facilities as it had promised. Ex. E(1) at pars. 33–36; E(2) at pars. 43–46; E(3) at pars. 28–29; and E(4) at pars. 29–30. Moreover, Nutmeg argues, because these allegations arise out of and are interrelated to Clear Lake's purported breach of contract and inverse condemnation, the exclusion precludes coverage of all the claims in these four petitions, and Nutmeg has no duty to defend Clear Lake in connection with the claims in them.

Nutmeg also maintains that there is no coverage for the claims against Clear Lake under the Liability Policy for several reasons.

First, Claimants do not assert that Clear Lake's liability arises from "bodily injury" or "property damage," as defined in the policy, that was caused by an accident. Nor do they allege damages arising out of an "employee benefits injury" as defined in the policy. Nor do Claimants assert claims for "personal injury" or "advertising injury." The petition does not allege that Clear Lake slandered or libeled Claimants, invaded their privacy, misappropriated their advertising ideas, infringed on their copyrights or slogans, falsely arrested or detained them, maliciously prosecuted them, or wrongfully evicted them. Instead they allege that Clear Lake breached contractual obligations to each Claimant relating to purchasing its sewer, water and drainage facilities and that Claimants are entitled to economic damages of cash or money payment for these facilities pursuant to the agreements with Clear Lake. The judgment in the underlying suit awarded damages only for breach of contract. Nutmeg insists that economic damages are not covered by the Liability Policy. *Houston Petroleum Co. v. Highlands Ins. Co.*, 830 S.W.2d 153, 156 (Tex.App.—Houston [1st Dist.] 1990, writ denied) (economic loss for property damages not covered). Thus, Nutmeg urges, there is no coverage for their claims under the Liability Policy, and Nutmeg does not owe a duty to defend or indemnify Clear Lake.

Second, Nutmeg insists, there is no coverage under the Liability Policy because Claimants' allegations and Clear Lake's

liability do not arise from an "occurrence" as required by the policy. Ex. a at 1. Texas cases have consistently ruled that "occurrence" provides coverage for only fortuitous events. *Meridian Oil Prod., Inc. v. Hartford Acc. & Indem. Co.,* 27 F.3d 150, 152 & n. 2 (5th Cir.1994) (noting that "Texas courts afford coverage for fortuitous damages but deny coverage when damages are the natural and probable consequences of intentional conduct."); *Republic Nat'l Life Ins. Co. v. Heyward,* 536 S.W.2d 549, 557 (Tex.1976) (concluding that injuries are "accidental"; "from the view point of the insured, the injuries are not the natural and probable consequence of the action or occurrence which produced the injury."). Claimants' allegations arise from Clear Lake's purported intentional breach of contract, which was allegedly voluntarily and deliberately undertaken. Thus Nutmeg concludes that it has no duty to defend or indemnify Clear Lake under the Liability Policy.

Third, Nutmeg argues that Claimants' requests for declaratory relief and mandamus do not constitute "damages" under the Liability Policy either. Because "damages" is not defined in the policy, the ordinary and generally accepted meaning should be used to construe the term. *Jarvis,* 197 F.3d at 746. *Miriam Webster's Collegiate Dictionary* at 291 (10th ed.1996) defines damages as "compensation imposed by the law for loss or injury." Thus Nutmeg has no duty to defend or indemnify Clear Lake for claims for declaratory relief or mandamus.

Fourth, three exclusions in the Liability Policy preclude coverage for Claimants' claims against Clear Lake, as was the case with the same exclusions under the E & O Policy: the exclusion for inverse condemnation; the exclusion for liability arising out of the purchase, sale, marketing, issuance or retirement of bonds; and the exclusion for liability arising out of obtaining remuneration or financial gain.

Finally, Nutmeg contends that there is no coverage under the Excess Policy because there is no coverage under the other two policies, which were designated as the controlling underlying insurance policies. Ex. C at 1. Thus Nutmeg also has no duty to defend or to indemnify with respect to the Excess Policy. *Cigna Lloyds Ins. Co. v. Kamins,* 924 S.W.2d 206, 210 (Tex. App.—Eastland 1996, no writ) (because no underlying insurance policy afforded coverage, the insurer's obligations under the excess policy were never triggered).

## CLEAR LAKE'S RESPONSE (# 40)

Clear Lake first urges the Court to find that the motion for partial summary judgment is premature because the state court judgment is on appeal and thus not final, so the issue of Nutmeg's duty to indemnify is not ripe. Clear Lake insists that Nutmeg has not met the standard set forth by the Texas Supreme Court in *Farmers Texas,* 955 S.W.2d at 84: "the duty to indemnify is justiciable before the insured's liability is determined in the liability lawsuit when the insurer has no duty to defend *and the same reasons that negate the duty to defend likewise negate any possibility the insurer will ever have a duty to indemnify.*"

Although Clear Lake argues that Nutmeg has the burden of proof to show that Clear Lake's claim is within the scope of coverage of the policies, the Court disagrees and refers the parties to its discussion of burden of proof under "APPLICABLE LAW." [13]

Clear Lake claims that Nutmeg has failed to address the duty to defend or to

---

**13.** Observing that Nutmeg contends that it is Clear Lake's burden to show that the claim in the underlying case satisfies the "eight corners" rule, Clear Lake argues that the general rule is not applicable here. Clear Lake maintains that because Nutmeg has paid and continues to pay all costs of Clear Lake's defense in the underlying suit and because Clear Lake is "pleased with the status quo" and is not

distinguish it from the duty to indemnify. It does not analyze the pleadings and the facts separately with respect to each duty, but has "blurred the concepts together, making it virtually impossible to file a meaningful response." Response at 12. Moreover, Clear Lake charges that Nutmeg has approached the duty to defend incorrectly; instead of examining the factual allegations in the petition and showing that not one gives rise to a potential claim within the coverage of the three policies, Nutmeg has reviewed its policies and concluded that there is no coverage. Clear Lake asserts that for Nutmeg to carry its burden to show that it has no duty to defend, Nutmeg must analyze each factual allegation in the governing petition and show both that (1) not one gives rise to a covered cause of action and (2) each factual allegation does not give rise to a claim that is "potentially" within the scope of the coverage.

Because Clear Lake is in error regarding burden of proof, the Court would point out that since Clear Lake bears the burden of demonstrating that Claimants' allegations raise potential claims that fall within the ambit of the policies' coverage, Clear Lake, not Nutmeg, should have followed the procedure Clear Lake describes and examined the factual allegations in Claimants' petition and identified the potential claims to which they give rise and demonstrated that those potential claims are within the scope of the policies' coverage.

In this action Clear Lake argues that Nutmeg has waived its defense of non-coverage because its December 15, 1998 reservation of rights letter (Ex. H to Nutmeg's motion) [14] was inadequate. Specifically Clear Lake contends that Nutmeg's December 15th reservation of rights letter was not proper, factually sufficient, or timely, and thus in effect there was no reservation of rights. Nor did Nutmeg did obtain a non-waiver agreement. Therefore Nutmeg should be estopped from asserting non-coverage under the three policies of the claims in the underlying suit against Clear Lake. In essence, Clear Lake maintains that Nutmeg has a duty to defend just as if it had not tried to send a reservation of rights letter.

According to Clear Lake, to be "sufficient" a reservation of rights letter should include (1) the name of the insurance company; (2) the applicable policy numbers; (3) the claim numbers; (4) the name and case number of the underlying lawsuit; (5) a clear and unambiguous notice to the policy holder whether and to what extent it will provide a defense; (6) notice of any actual or potential conflicts of interest; (7) advice to the policyholder of its right to seek independent counsel in the underlying suit; (8) identification of every exclusion, condition, provision or limitation that may limit or eliminate coverage and provide at minimum a brief explanation why it may apply; and (9) a specific reservation of the right to assert individual coverage defenses if new information is later obtained. Lee Shidlofsky, *Reservation of*

seeking anything from the Court other than costs, while Nutmeg seeks the remedies and relief from the Court in this suit and has filed the motion for summary judgment. According to Clear Lake, in the usual case, the insurer has refused to pay the costs of the defense, forcing the insured to sue, and the insurer files a counterclaim for a declaratory judgment. Thus both sides seek affirmative

relief, justifying placing a burden of proof on the insured. It cites no authority for its version of burden of proof. The Court rejects the argument as erroneous. *See, e.g., American National General*, 274 F.3d at 324; *Sentry Ins. v. R.J. Weber Co.*, 2 F.3d 554, 555 (5th Cir. 1993).

14. *See* footnote 6 of this memorandum and order.

*Rights and Denial of Coverage (2001 Update)* at 10–11 (Insurance Law Seminar, University of Houston Law Center, May 17–18, 2001) (Copy attached to Response). Clear Lake charges that Nutmeg's December 15, 1998 letter fails to satisfy the eighth requirement.

Moreover, Nutmeg sent a second reservation of rights letter on September 27, 2001 (Ex. A to Response), which was modified and reissued on December 10, 2001 (Ex. B to Response), approximately three years after the underlying suit was filed. Clear Lake contends that the last two highlight the insufficiency of the first. It also maintains that there is no reason why the initial letter could not have been properly written early in the state court litigation, as evidenced by the various petitions filed in that action (Ex. E(1–6)) to Nutmeg's motion. Furthermore Clear Lake insists that Nutmeg cannot rely on the last two letters to cure the inadequacy of the first, because the jury rendered its verdict in the underlying suit on March 2, 2001, more than six months before the last two were written and nearly three years after the underlying suit was filed. Clear Lake also argues that the fact that Nutmeg issued the last two, far more comprehensive letters raises a fact issue as to whether the first letter was adequate as a matter of law and whether Nutmeg issued the last two because it questioned the adequacy of the first.

Clear Lake also contends that the bond exclusion in both the E & O Policy and the Liability Policy does not apply. According to Clear Lake, the language of the exclusion, which is the same in both policies ("Liability arising out of the purchase, sale, marketing, issuance or retirement of bonds or other debt instruments by any insured"), limits the exclusion to actions occurring after bonds have been authorized by the issuing entity. The factual allegations in the petition pertain to acts that occurred before the bonds had been authorized, to actions of Clear Lake in an alleged attempt to persuade voters to deny Clear Lake the authority to issue the bonds. Nor has Nutmeg traced these factual allegations and showed that any of them gives rise to a potential cause of action under the three policies, thus failing to carry its burden on a duty to defend.

Clear Lake maintains that paragraphs 15–20 of the Fifth Amended Petition potentially state a claim for libel, slander or disparagement under the definition of "advertising injury" in both the E & O Policy and the General Liability Policy by alleging factually that "some members of the Board of Directors of the Water Authority or persons acting on behalf of the Water Authority distributed newsletters, disseminated false information, and took other actions to defeat the May bond election." [15]

Clear Lake maintains that Claimants have asserted a potential claim under the

---

**15.** Paragraphs 15–20 of the Fifth Amended Petition state the following:

15. Despite repeated requests from Plaintiffs, the Water Authority has refused to sell revenue bonds or allocate available funds (including voter-approved bond funds) to purchase the Facilities "as soon as possible." · ·

16. Instead of selling revenue bonds or using funds in its accounts to honor its contractual obligations to Plaintiffs, the Water Authority has stated that because May and October 1998 bond propositions relating to the purchase of the Facilities failed, it

had no duty or obligation to purchase the Facilities from Plaintiffs unless and until another bond election passes (a conclusion of law which Plaintiffs deny and the express terms of the Sales Agreement controvert).

17. However, even if the passage of the bond election is a condition precedent to the Water Authority's obligation to purchase the Facilities, the May and 1998 bond propositions relating to the purchase of the Facilities failed due to the actions of the Water Authority. Thus, the Water Authority actively defeated the condition precedent to its obligation.

E & O and the Liability Policies, Claimants have also asserted a potential claim under the Excess Policy.

### NUTMEG'S REPLY (# 43)

Nutmeg correctly responds that Clear Lake had the burden of proof in demonstrating that the allegations of the underlying suit are potentially within the policies' coverage. Nutmeg also emphasizes that Clear Lake has failed to refute the majority of Nutmeg's coverage defenses: that the E & O and Liability Policies' exclusion for liability relating to the purchase, sale, marketing or issuance of bonds precludes coverage for the underlying suit; that the underlying suit does not assert a covered "advertising injury"; and that Nutmeg did not waive its right to assert its coverage defenses here.

■■■ First, Nutmeg insists that "coverage" in the context of insurance may be invoked in connection with both the duty to defend and the duty to indemnify. *Trinity Universal Ins. Co. v. Cowan*, 945 S.W.2d 819, 821–22 (Tex.1997).[16] In addressing both the coverage provisions and

18. The Water Authority initially called a bond election for February 7, 1998, in which the voters would have voted on propositions distinguishing developer reimbursements from other Water Authority projects. The February 7, 1998 election was canceled on the advice of counsel. The election was rescheduled for May 2, 1998, and all or some members of the Board of Directors of the Water Authority or persons acting on behalf of the Water Authority distributed newsletters, disseminated false information, and took other actions to defeat the May bond election. For example, Board member Gayle Yoder distributed a memorandum to voters referring to the May 2 bond election as combining "taxpayer subsidies" to developers with "critical Water Authority needs." The memorandum further referred to the propositions in the election as "arbitrary," and went on to falsely state that "[d]evelopers were never guaranteed that subsidies would be paid, only that their infrastructure costs would be included for consideration by the voters in the next bond election." As a result of this and other actions, the May bond election failed.

19. The Water Authority scheduled another bond election for October 3, 1998. Board member Don Johnson, however, stated that he opposed calling another bond election until changes to the Water Authority's policies toward developers had been formally addressed. Mr. Johnson actively campaigned against the October 1998 election by placing "vote no" signs at the Water Authority (one of the places where voters cast their ballots) and in the area. Upon information and belief, Board member M. Elliott Cooper campaigned against

the October 1998 election as well. In this election, the Water Authority separated developer reimbursements from other Water Authority needs and failed to support developer reimbursement (Proposition 2) in the same manner as the other projections (Proposition 1). Proposition 1 passed; Proposition 2 failed.

20. All actions of the members of the Board of Directors of the Water Authority relating to the Sales Agreements, the 1998 bond elections and the refusal to purchase Plaintiffs' Facilities were taken in their official capacities as board members, or as agents with actual, apparent, and/or implied authority to act on behalf of the Water Authority. In addition, the Water Authority has ratified and adopted any such actions by its board members.

16. Clear Lake argues that *Cowan* dealt with construing the meaning of two terms commonly used in insurance policies (i.e., "bodily injury" and "accident") and that the failure to distinguish between the duty to defend and the duty to indemnify was of no importance in the opinion.

With its narrow focus, Clear Lake misses the larger import of the case. This Court observes that as a matter of law, since the Texas Supreme Court in *Cowan* held that the term "bodily injury" in the policy does not include purely emotional injuries, that conclusion controls as to both (1) allegations and potential claims of purely emotional injuries without physical manifestations and (2) actual, proven facts of emotional injuries without physical manifestation. Under the holding, the absence of physical injury therefore affects coverage under both the duty to defend and the duty to indemnify. If there is no

exclusions in its motion, Nutmeg used "coverage" to discuss both duties, as is proper and appropriate under Texas law. Nutmeg insists that it focused mainly on allegations in the petition and demonstrated that under the eight corners doctrine, the petition's allegations failed to fall within the coverage provisions of the policies and were excluded under several of the policies' exclusions, and therefore Nutmeg has no duty to defend. For the same reasons, it also has no duty to indemnify. *American States Ins. Co.*, 133 F.3d at 368 ("Logic and common sense dictate that if there is no duty to defend, there is no duty to indemnify."); *Thom*, 10 F.Supp.2d at 700 ("The reasons that negate a duty to defend ... will negate any possibility that the insurer will ever have a duty to indemnify.").

Nutmeg highlights the fact that Clear Lake has not disputed and argues that Clear Lake cannot defend against the following points made by Nutmeg: (1) the claims in the underlying suit arise from a breach of contract and are not covered under the policies; (2) because the underlying suit does not involve claims arising from an "occurrence" or involving an "error or omission" injury, they are not covered under the E & O Policy; (3) the inverse condemnation exclusion in the E & O Policy and the Liability Policy preclude coverage for the claims in the underlying suit; (4) the two policies' exclusion for liability arising out of remuneration or financial gain preclude coverage for the claims in the underlying suit; (5) because the underlying suit does not involve claims or liability arising from "bodily injury" or "property damage" or "personal injury", its allegations are not covered under the Liability Policy; (6) because the claims in

the underlying suit do not arise from an "occurrence," they are not covered under the Liability Policy; (7) the policies do not cover claims for declaratory and mandamus relief.

The Court notes, contrary to a statement by Nutmeg, that Clear Lake did concede that if there is no coverage under the E & O and Liability Policies, and if there is therefore no duty to defend or indemnify, there can be no coverage under the Excess Liability Policy. Response at 20–21. Of course Clear Lake does not agree that there is no coverage of Claimants' allegations and potential claims based on those allegations.

Nutmeg observes that the sole exclusion addressed by Clear Lake is the bond exclusion. Clear Lake cites no authority and provides no explanation for its contention that the exclusion is "limited in time to actions occurring after bonds have been authorized by the issuing entity." Nutmeg contends that the broad exclusion encompasses any conduct resulting in liability that arises out of the purchase sale, issuance and/or marketing of bonds. The Fifth Circuit has held that terms like "arising out of" in an insurance policy exclusion are "broad, general, and comprehensive effecting broad coverage". *American States Ins. Co.*, 133 F.3d at 370. Moreover the phrase means that the claim "need only bear an incidental relationship to the described conduct for the exclusion to apply." *Scottsdale Ins. Co.*, 173 F.3d at 943. Nutmeg insists the allegations in the petition have more than an incidental relationship to the marketing, issuance and sale of bonds: the petition asserts that Clear Lake is liable for improperly failing to conclude the sale of bonds [17]; that Clear

---

physical injury potentially alleged, both duties are negated.

**17.** Ex. E(6), pars. 14–15, 23 ("it cannot 'unreasonably with[hold] its consent and/or ap-

proval to sell revenue bonds' "; "the Water Authority has refused to sell revenue bonds ...").

Lake did not properly "issue" bonds[18]; and that Clear Lake engaged in "marketing activities" in calling for and scheduling bond elections, and in actively "campaigning" against bond elections to members of the public.[19] Nutmeg concludes that the underlying claims arise from Clear Lake's purported acts and omissions in the marketing, issuance and sale of bonds and its failure to consummate the issuance and sale of the bonds. Thus in sum Clear Lake's liability, which stems from its alleged breach of its contractual obligation to purchase the water facilities through bond funding, is excluded from coverage because the claims "arise out of" the sale and marketing of bonds.

In response to Clear Lake's asserted potential claim for slander, libel or disparagement that triggers coverage under the E & O and Liability Policies, Nutmeg contends that it does not constitute an "advertising injury" that is covered under either of the two policies. First, the E & O Policy expressly excludes coverage for "advertising injury." Ex. A at 2 par. 3(a). There is no coverage under the Liability Policy by its own terms because there was no "offense" committed in the course of the advertising Clear Lake's goods, products or services. The Liability Policy defines "advertising injury" as one "arising out of one or more of the [enumerated] 'offenses' committed in the course of advertising your goods, products or services." Ex. B at 13. This provision and its terms "define[ ] coverage with respect to 'advertising injuries.'" *Sentry*, 2 F.3d at 556 (observing that the policy provided coverage only if the insured engaged in copyright infringement during the course of its advertising; if infringement were committed in another context, there would be no coverage). Clear Lake has the burden of demonstrating that the advertising related to its "goods, products or services." *Id.* But Clear Lake has not alleged that it engaged in advertising its "goods, products or services"; instead it has alleged advertising relating to the passage of propositions for the issuance of bonds. Ex. E(6), pars. 7–19. Nutmeg argues that a financing package is not a "good, product or service of Clear Lake". Rather, Clear Lake is in the business of providing water to customers.[20] Because Clear Lake's alleged conduct does not constitute advertising of its "goods, products or services, there is no coverage under the Liability Policy.

Furthermore, Nutmeg claims the underlying allegations do not raise a potential claim for libel or slander or disparagement sufficient to constitute an "advertising injury" under the E & O or Liability Policies. Not only did Claimants not expressly assert such a cause of action, but it is clear from the verdict and judgment that Claimants were not and are not pursuing such claims because there was no instruc-

---

18. *Id.*

19. *Id.* at pars. 15–20.

20. Complaining that there is no summary judgment evidence showing that the only "good, product, or service" that Clear Lake can advertise is water, and without presenting any explanation of the basis for its opinion, summary judgment evidence, or authority (dictionary or law), Clear Lake argues that the bonds, when and if issued, "are certainly going to be a 'good, product, or service' of Clear Lake."

The Court notes that *Websters' Third New International Dictionary (Unabridged)* (Miriam Webster 1986) defines "good" as "a tangible movable personal property having intrinsic value and usually excluding money." It defines "product" as "something produced by physical labor or intellectual effort—the result of work or thought." *Webster's Third* defines "service" as "performance of work commanded or paid for by another" or "an act done for the benefit of or at the command of another."

tion or finding as to those issues.[21] Nutmeg's Exs. D & G. Moreover, Nutmeg argues, the petition's allegations do not even "potentially" state a claim for libel under Texas law because the petition does not suggest in paragraphs 15–20 that Clear Lake made defamatory or disparaging statements *against Claimants,* but instead any alleged statements were directed toward Clear Lake's bond election. Under Texas law, defamatory statements about one's own self are not actionable. *See, e.g., Marshall v. Mahaffey,* 974 S.W.2d 942, 949 (Tex.App.—Beaumont 1998, writ denied) (plaintiff in a slander action must be the person about whom the allegedly defamatory statements were made); *Baubles & Beads v. Louis Vuitton, S.A.,* 766 S.W.2d 377, 381 (Tex.App.—Texarkana 1989, no writ) (plaintiff in libel action must be the person about whom the allegedly defamatory statements were made). As a matter of law, notes Nutmeg, Clear Lake cannot ask this Court to read facts into the pleadings or imagine scenarios that may constitute an "advertising injury" triggering coverage under the policies when such facts and scenarios do not exist. *St. Paul,* 249 F.3d at 394.

Even if the Court concluded that the underlying allegations included a potential "advertising injury," the claim would be excluded under the Liability Policy, Nutmeg insists. As previously argued, Clear Lake's alleged conduct in connection with the bond elections is excluded because it arises out of Clear Lake's purported breach of contract.[22] Nutmeg's Ex. B

at 5 § I(2)(p)(1). Nutmeg argues that all of these alleged statements relate to the water facility purchase contracts, and Claimants' allegations arise from Clear Lake's failure to satisfy its contractual obligations to obtain funding for the purchase. Claimants expressly connect Clear Lake's challenged conduct to the alleged contractual obligations throughout the petition. Nutmeg Ex. E(6) pars. 17 and 27 (alleging that Clear Lake's actions relating to the bond elections constituted breach of contract). The Liability Policy clearly and expressly excludes coverage for all advertising injuries that "arise out of breach of contract, except for misappropriation of advertising ideas under an implied contract." Nutmeg Ex. B at 5 § I(2)(p)(1). As noted, "arising out of" must be broadly construed and a claim need bear only an incidental relationship to the described conduct for the exclusion to apply. *American States Ins.,* 133 F.3d at 370; *Scottsdale Ins. Co.,* 173 F.3d at 943.

The Liability Policy also clearly excludes from coverage "advertising injury" "[a]rising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity." Nutmeg Ex. B at 5 § I(2)(o)(1). The petition alleges that Clear Lake "actively defeated," "took other actions to defeat," and took action "that was intended to cause . . . the defeat of the bond propositions." Nutmeg Ex. E(6) pars. 17, 18, 27. These allegations are based on alleged false statements that Clear Lake purportedly knowingly disseminated in order to defeat the bond election.[23] These allegations fall

---

21. As the Court has indicated, this argument is not appropriate under the test for coverage under the policy and the duty to defend.

22. Clear Lake argues that at the time the advertising injury occurred, there was no and there could not have been a breach of contract (and there never was a breach of contract). Claimants in the underlying suit alleged that the breach of contract occurred

*after* the incidents that purportedly gave rise to the advertising injury. Thus Nutmeg has a duty to defend these issues, and where there is a duty to defend any part of a suit, there is a duty to defend the entire suit.

23. Clear Lake insists that nothing in the pleadings implies that Clear Lake's board members, individually or in their capacity as

within the ambit of the quoted exclusion.

Moreover, insists Nutmeg, regardless of Clear Lake's focus on "potential" advertising injury, these advertising injury claims are still excluded because of the claims in the underlying suit that arise out of the alleged breach of contract, inverse condemnation, liability arising out of remuneration or financial gain to which it was not legally entitled, and liability arising out of the purchase, sale, issuance and marketing of bonds.

As for Clear Lake's challenge to the December 15, 1998 reservation of rights letter, Nutmeg emphasizes that Clear Lake has not cited a single case adopting a bright-line rule for adequacy of a reservation of rights letter nor pointed to authority establishing clear requirements for such. Even its cited article by Shidlofsky notes that "there are no 'magic' words that must be in every reservation of rights letter." Response, Ex. 2 at 10. Nutmeg maintains that there are no explicit requirements for a reservation of rights and that its letter was sufficient to reserve its rights.

Nutmeg notes that in *Ideal Mutual Ins. Co. v. Myers,* 789 F.2d 1196, 1201 (5th Cir.1986), the Fifth Circuit rejected an argument that an insurer waived its coverage defenses by failing to provide an adequate reservation of rights letter. The appellate court found that the letter in dispute advised the insured of the insurer's investigation and reservation of rights, including its right to withdraw, but the letter did not identify specific policy provisions that the insurer contended precluded coverage. *Id. Cf. J.E.M. v. Fidelity & Cas. Co.,* 928 S.W.2d 668, 672–74 (Tex.App.—Houston [1st Dist.] 1996, no writ) (determining reservation of rights letter was sufficient and stating, "We can find no authority to require [an insurer] to categorically

deny coverage before offering to defend [the insureds] under a reservation of rights.").

In its December 15, 1998 reservation of rights letter (Ex. H), Nutmeg advised that Nutmeg would "proceed with the investigation under a strict reservation of rights." Although Nutmeg did not list each policy provision that might be in issue, Nutmeg insists that the letter constituted clear notice of possible coverage issues regarding injunctive and administrative relief, and it was sent to Clear Lake's attorney, whose counsel Clear Lake had the benefit of from the beginning of the litigation, and counsel was on notice that his acceptance of payments of defense costs was conditioned upon Nutmeg's later right to disclaim coverage after it completed its investigation. Nutmeg maintains that the letter was a sufficient reservation of rights and not a waiver of any of its coverage defenses.

■ Furthermore, under Texas law, to establish waiver or to estop the insurer from asserting its coverage defenses, the insured must demonstrate that it suffered "clear and unmistakable" harm caused by the insurer's actions. *Certain Underwriters at Lloyd's London v. Oryx Energy Co.,* 142 F.3d 255, 257 n. 2 (5th Cir.1998)(applying Texas law). Nutmeg argues that even if its December 15th letter were insufficient, Clear Lake cannot, as a matter of law, show that it has actually been prejudiced by Nutmeg's alleged failure to provide it with a timely and sufficient reservation of rights letter. The letter clearly notified Clear Lake that it would be investigating the bases of Claimants' claims subject to a reservation of rights and that there were coverage issues. Clear Lake is a large governmental entity with the benefit of counsel and operating on an equal footing with Nutmeg. Moreover, Nutmeg

board members, disseminated anything "with knowledge of its falsity."

paid for and allowed Clear Lake to select its counsel for its representation in the underlying suit and permitted Clear Lake to direct that defense. Nutmeg insists Clear Lake was not caught unawares nor prejudiced.

### CLEAR LAKE'S SUR–REPLY (# 45)

In its sur-reply, Clear Lake essentially reiterates what it said in its response or presents arguments that the Court has inserted in the above discussion, where relevant.

### COURT'S RULING

 As the Court has indicated, Clear Lake has the burden of proof of identifying the potential claims from the specific allegations in Claimants' fifth amended petition and demonstrating that they fall within the scope of coverage of one of the three policies. Clear Lake has not met that burden.

 As a threshold matter, this Court also agrees with Nutmeg, and Clear Lake has not contested the fact, that "damages" as defined in the E & O Policy, i.e., in relevant part, "a monetary judgment, award or settlement," and its generally accepted meaning of "compensation imposed by the law for loss or injury," applied to the Liability Policy, excludes Claimants' prayer for declaratory and mandamus relief.[24]

This Court agrees with Nutmeg that the claims in the controlling pleading all arise out of the intentional breach-of-contract cause of action. Moreover, the Court concurs that generally liability policies do not cover intentional breaches of contract by an insured. *See, e.g., Scottsdale Ins. Co. v. Travis,* 68 S.W.3d 72, 75 (Tex.App.—Dallas 2001, pet. denied), ("Because the purpose of insurance is to protect insureds against

unknown, or fortuitous risks, fortuity is an inherent requirement of all risk insurance policies"), *citing Two Pesos,* 901 S.W.2d at 502; *Gibson & Associates,* 966 F.Supp. at 473–74 (and cases cited therein) ("the great majority of jurisdictions seem to agree that a breach of contract does not represent an 'occurrence' within the meaning of that term as defined by commercial general liability policies .... '[C]ourts universally have interpreted liability coverage provisions ... as referring to liability sounding in tort, not in contract. . . . [citation omitted]' "). Moreover, although the Texas Supreme Court has not ruled on the question, the Fifth Circuit has construed the phrase "legally obligated to pay as damages" in general commercial liability policies and concluded that in Texas, the language applies only to damages arising out of tortious acts and does not cover contractual obligations. *Data Specialties,* 125 F.3d at 911–13.

Furthermore, Nutmeg is correct in arguing that commercial liability policies do not cover the "natural and probable consequences of intentional conduct." *Meridian Oil,* 27 F.3d at 152 n. 2; *see also State Farm Lloyds v. Kessler,* 932 S.W.2d 732, 738 (Tex.App.—Fort Worth, 1996, writ denied) ("Under Texas law, when the insured's acts are voluntary and intentional, the results or injuries, even if unexpected, are not caused by an 'accident,' and therefore the event is not an 'occurrence' under the policy."). Thus the dropped fraud claims previously asserted by Claimants would also not be covered under the Liability Policy.

 The Court disagrees with Clear Lake that it is covered for Claimants' allegations of an advertising injury arising out of what Clear Lake characterizes as a

---

24. A technical argument could be made that the definitions also exclude any remedy for the equitable claim of quantum meruit, i.e., restitution of benefits conferred on a party that it would be unjust for it to retain.

claim for libel, slander or disparagement in its pleadings, Ex. E(6) at paragraphs 15–20 (see footnote 14) in the Liability and E & O Policies. Clear Lake's interpretation of these vague paragraphs is a strained, indeed tortured, attempt to twist indefinite statements to create a factual scenario that might suggest a libel/slander claim to trigger coverage. *Merchants Fast Motor Lines*, 939 S.W.2d at 142. Even if the Court were to accept such an unreasonable reading, the claim would be barred by the clear and unambiguous bond exclusion in the policies, as will be discussed.

■ The Court concludes that not only is there no coverage for damages arising from Claimants' intentional breach-of-contract and advertising-injury claims, but that Nutmeg has met its burden of demonstrating that certain exclusions in both the Liability and E & O Policies apply to exclude coverage of Claimants' explicit and potential causes of action.

First, the bond exclusion found in both policies bars coverage for all Claimants' allegations that Clear Lake made no effort to obtain or interfered with or thwarted or failed to obtain the issuance of bonds as well as their claim that it refused to use surplus bond proceeds to purchase Claimants' facilities. The Court agrees with Nutmeg that Clear Lake's arbitrary reading of the exclusion to be limited to the time after bonds have been authorized.

■ So, too, does the clear exclusion in both policies of coverage for "liability arising out of or in any way connected with … eminent domain … or inverse condemnation" bar coverage for Claimants' taking claim in violation of the Texas Constitution.

■ Third, both policies contain unambiguous exclusions for liability for obligations assumed by the insured under a contract or an agreement, thus precluding coverage for claims of breach of contract or quantum meruit.

■ Moreover, the E & O Policy's exclusion for fraud (Ex. A at 2) clearly and unambiguously excludes any potential claims for fraud or misrepresentation in the first four petitions filed by Claimants based on Clear Lake's alleged promises that funds would be available for it to purchase the facilities.

■ In addition, the Court concludes that Nutmeg's application of a broad reading of "arising from" or "connected to" or "related to" or "interdependent with" an excluded act to preclude coverage for such derivative claims is persuasive here. Claimants' breach of contract and quantum meruit claims do logically arise out of the unconstitutional taking claim, if a taking is found to have occurred, while their causes of action for breach of contract and quantum meruit are connected to the allegations regarding bonds for which coverage is barred by the relevant exclusion in each policy.

Both parties agree, and the Court concurs, that coverage under the Excess Policy is not triggered if there is no coverage under either of the other two policies. The Court finds this to be the case here.

■ In addition, the Court rejects Clear Lake's arguments that the first reservation of rights was inadequate and that Clear Lake has waived or should be estopped from asserting that there is no coverage under the policies. While the letter could have been more specific, Clear Lake has failed to provide any law demonstrating that there are specific requirements for a valid reservation of rights letter. Moreover, as Nutmeg has shown, Clear Lake cannot demonstrate that it was harmed, since Nutmeg paid for its defense and permitted Clear Lake to select its own counsel and control its defense in the un-

derlying suit and thus cannot prevail on its waiver and estoppel arguments.

Because Clear Lake has not demonstrated that Nutmeg has a duty to defend it against any potential claims in the suit below, the Court concludes that based on the same facts, Nutmeg has no duty to indemnify Clear Lake for any judgment against it arising out of those claims.

Accordingly, the Court

ORDERS that Nutmeg's motion for partial summary judgment is GRANTED.